63 N.J. Super. 395 (1960)
164 A.2d 754
EVELYN B. BROWER, PETITIONER-APPELLANT,
v.
MICHAEL ROSSMY, T/A MICHAEL OF VIENNA, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1960.
Decided October 24, 1960.
*397 Before Judges CONFORD, FOLEY and KILKENNY.
*398 Mr. William R. Gilson argued the cause for petitioner-appellant (Messrs. McKirgan & Gilson, attorneys).
Mr. Ralph Porzio argued the cause for respondent-respondent.
The opinion of the court was delivered by KILKENNY, J.A.D.
This is an appeal from a judgment of the Morris County Court, affirming the dismissal of a claim petition by the Workmen's Compensation Division.
The deputy director and the County Court concluded that the petitioner had failed to sustain the burden of proving that she was an "employee" of respondent within the meaning of N.J.S.A. 34:15-36. Whether the petitioner was respondent's "employee" at the time of the accident on February 12, 1957, when she slipped and fell on the floor of respondent's premises, thereby sustaining a broken hip, is the sole issue on this appeal.
It has been stipulated that if the petitioner was the respondent's employee, and thus covered by the Workmen's Compensation Act, she will be entitled to receive temporary disability of 31 weeks, permanent disability of 22 1/2%, and her medical expenses amounting to $1,160.06 paid, and $100 to be paid directly to her attending physician, Dr. William U. Cavallaro.
Prior to March 1956, and since then, the respondent conducted his business in a house owned and renovated by him in Chatham, New Jersey, using the name of "Michael of Vienna, International Hair Stylist." In a newspaper interview on March 8, 1956, relating to his business, the respondent expressed an intention to expand his operations from its then existing concentration on hair styles and coloring, to provide "for a complete beauty service with complete massage and hair styling." The petitioner, 60 years of age, with some 40 years' experience in working at her specialty of administering facial treatments in nearby Millburn, New Jersey, read this newspaper report. Some time thereafter *399 she spoke with the respondent with reference to the report and her willingness to enter into an arrangement with him as "facial operator" in his salon. The respondent then had two vacant rooms in his establishment across the hall from the rooms in which he was operating his hairdressing business, which were not then quite ready for use, and the parties discussed the use thereof for the facial treatment work of the petitioner.
Petitioner and respondent made an oral agreement providing for the petitioner to move into these rooms as soon as they were suitably prepared. This necessitated cleaning and redecorating, which work was done by the respondent at his expense. One of the rooms was to be used by the petitioner for her work. They discussed the furniture and equipment needed for this room. The petitioner advised respondent that she had her own chair used for the facials, a dressing table, another chair to sit on, and a vibrator which she would furnish. She did furnish these items. It was also understood that she would pay for the towels or linen service used in giving the facials. In the other vacant room, the respondent had a showcase worth about $1,000. It was agreed that he would display cosmetics in the show case, that the petitioner would sell and promote the sale of the cosmetics, and that she would receive 15% commission on any cosmetics sold by her. As to cosmetics used by her in the facial treatments, it was understood and agreed that the respondent could make large purchases in bulk at a very substantial discount, and that he would purchase the same in his name, and he would be reimbursed for the cosmetics used at the cost.
The question of compensation to be paid to and received by the respective parties was also discussed. It was finally agreed that the income from the giving of the facials by petitioner would be divided, 75% to the petitioner and 25% to the respondent. This division was not specifically called salary, or rent, or by any other name at the time the oral agreement was entered into.
*400 In November 1956 the petitioner moved in with her facial chair, dressing table, other chair, and electric vibrator and began operations. About a dozen of her own former clientele from Millburn, where she had been giving facials, followed her to this new enterprise. The respondent's former sign outside of his salon referring to him as "Michael of Vienna, International Hair Stylist" was continued, but respondent placed another smaller sign beneath the other, which read "Facial Treatments." The petitioner's name did not appear in any way on that additional sign. The obvious inference was left with the passerby and respondent's customers that "Michael of Vienna" had enlarged his hair styling business to include facial treatments. His conduct permits an inference that he, too, regarded her operations as an integral part of his beauty parlor business.
The petitioner was furnished with no key. Since the respondent closed his establishment on Mondays and worked only between Tuesday and Saturday of each week, the petitioner did no facial treatment work on Monday, but performed only from Tuesday to Saturday, when the respondent's place of business was open to his customers.
No separate telephone was installed for the petitioner; instead, the telephone of the respondent was used to make all appointments whether for a hair styling job or a facial treatment operation. He paid for all the telephone service. The respondent and his other employees made all appointments for the petitioner and she did not in any way control, according to the record, the hours of those appointments or the persons for whom the appointments were made. In addition to her own dozen former customers, the respondent supplied an additional 35 or 40 customers, so that he furnished the vast majority of the customers to whom she gave facials. Her hours of attendance at the respondent's salon were mainly determined by the appointments which he and his assistants made for her. On occasions, when she had taken care of her appointments for the day, she left. On some days when there were no scheduled appointments, she came in nevertheless *401 on the possibility that there might be some business during the day. When the respondent was busy and she was free, she would answer the telephone and arrange appointments not only for facial treatments but also for hair styling. On occasions she would take out the hairpins of customers who had received a hair-do from him or his assistants.
When a customer would receive a facial treatment, petitioner would make out the charge on slips furnished by the respondent, which were similar to the slips used by him in the hair styling phase of his business. The customers would not pay the petitioner, but instead would pay the respondent at a desk where the payments were made. She never collected the charges for the facial treatments. When the customers made out checks in payment of the facial treatments, the checks were always made out to the respondent, "Michael of Vienna." The respondent kept all records of payments received and calculated the total receipts at the end of each week from the separate slips used in the facial treatment department, and after deducting therefrom any sums due to him for cosmetics furnished by him to petitioner in the facial treatment work, he allocated 75% of that net income to her and retained the other 25% for himself.
Because of petitioner's many years of experience she was an expert in facial treatment, whereas respondent had very little or no knowledge as an expert in that phase of the business. Therefore, he exercised no control over her in the actual giving of facial treatments. There was no need for him to do so since she knew more about that particular work than he did. He did exercise some control insofar as the making of the appointments was concerned and she submitted to that control in the fulfillment of all appointments made by him. She never exercised any discretion to refuse those appointments, and she remained at the establishment until the appointments were satisfied.
As to the charges for facials, she suggested that it would be advisable to charge $6 per treatment, or $30 for a course of six treatments. It was his thought that the charge ought *402 to be higher because of the high caliber of the establishment which he was operating. But she "persuaded" him and he finally agreed with her, and the price was fixed pursuant to her suggestion. Whenever it became necessary to make refunds because of the cancellation of any part of such a series of facial treatments, the refunds were handled by and made by the respondent.
It is clear that the facial treatments became an integral part of the respondent's establishment, evidenced by the two signs outside, and manifested by the interrelation within. The arrangement was mutually beneficial to the parties since many who came to him for hair styling indulged the full beauty treatment by also obtaining a facial from her. Similarly, some who came to her for a facial reciprocally yielded to the temptation to buy his cosmetics, which she sold for him at a commission of 15%, and were attracted to the hair styling phase of the business. The performance of her services was so intertwined with his salon as to constitute part of his over-all business activity. He chose to make it appear so.
The contention of the respondent was that the petitioner was not his employee, but an independent contractor, and that their relationship was one of landlord and tenant, in which she paid him 25% of her net income as rental for the room in his building, occupied and used by her. In support of this contention of independent contractor he makes the following points.
He argues that the arrangement allowed her 75% of the net income and gave him only 25%, thereby negating that she was only an employee, since she received the larger portion of the net income. But as she testified without contradiction, this was not an unusual split, but a customary arrangement, similar to that which had existed in her prior place of operations where she was classified as an employee.
She paid for towels and linen service. She had no fixed hours for working, but could come and go as she pleased. However, he controlled her hours of work by making the *403 appointments, and she kept these appointments. She furnished the facial chair, the dressing table, the chair to sit down on in her room and an electric vibrator. But she did so voluntarily and saved him the expense of doing so. He states that she performed her facial treatments in a separate room across the hall from the rooms occupied by him, and that there was a door on her room which furnished her with privacy. But that seems only a matter of practical expediency born of the need for some privacy by the customers. He argues that he exercised no control over her and at no time directed the manner in which she administered the facial treatments. There was no need for such control since she was an expert. He says that she suggested the price of six treatments for $30, and that she was the one who fixed the price without any right on his part to modify the same, but his testimony was:
"A. Mrs. Brower spoke to me about the prices and she said would it be all right with me to charge six dollars for one facial and thirty dollars for the series of six, that one facial would be five dollars which I said it is all right with me."
There is a dispute in the testimony as to why no withholding tax was deducted from the payments made to petitioner by respondent, and why no social security reports were made by him as to her. The Deputy Director found, and we deem properly so, that when she discussed the matter with him and requested him to withhold her tax, he referred her to his accountant. It is admitted that she discussed this matter with his accountant. The testimony of his accountant as to the reasons for not listing her as his employee were found by the Deputy Director to be unworthy of belief, and we agree. Confronted with a refusal to list her as an employee, she made out her own income tax returns and referred to herself therein as "self employed." From this respondent contends that she admitted that she was not his employee. It seems clear that her status was somewhat equivocal, but it was made so by reason of his arrangement *404 with her. Her so-called admission was born of the necessity of reporting income and his refusal to report her as an employee for income tax purposes. The benefits of the Workmen's Compensation Act may not be surrendered by any false label which an employee in fact may put upon his working relationship with another.
While there are some factors here which permit a fair argument that petitioner was an independent contractor, there are many factors which tend to show that she was an employee. The Deputy Director felt that the proofs were in "equipoise" and so he dismissed her petition on the simple basic ruling that she had failed to sustain the burden of proof by the preponderance of the evidence. His finding of equipoise showed her status was at least equivocal. The County Court found from the facts adduced that she was not an employee, placing great stress upon the absence of control. While control may be an important factor in determining whether or not a person is an employee under some circumstances, it is not the only factor. A clear showing of control leads easily to the affirmative conclusion that an employer-employee relation existed. But absence of control of details of the work, where not appropriate in the light of the skill of the employee in the circumstances under which the work is done, is not necessarily significant. A test more realistic to the objects and purposes of workmen's compensation and relevant in circumstances such as those shown here is known as the "relative nature of the work test." Under this doctrine, the control factor, though still pertinent to some extent, is minimized when certain fact patterns appear.
Previous to the dissent in Marcus v. Eastern Agricultural Ass'n, Inc., 58 N.J. Super. 584, 596 (App. Div. 1959), which dissent was adopted by the Supreme Court in its reversal, 32 N.J. 460 (1960), the criterion to which our courts had most frequently referred in determining the character of the relationship, as employee or independent contractor, had been that of "control," defined as the right to direct the manner in which the business or work shall be *405 done, as well as the results to be accomplished. De Monaco v. Renton, 18 N.J. 352, 355 (1955); Piantanida v. Bennett, 17 N.J. 291 (1955); Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261 (1953); Cappadonna v. Passaic Motors, Inc., 136 N.J.L. 299, 300 (Sup. Ct. 1947), affirmed per curiam 137 N.J.L. 661 (E. & A. 1948).
In Mahoney v. Nitroform Co., Inc., 20 N.J. 499 (1956), the court held that the control test is satisfied when the employer has the right of control, and it is not requisite to prove its actual exercise, citing 1 Larson Workmen's Compensation, sec. 44.10, p. 638; sec. 44.32, p. 645.
While recognizing that the ultimate right of control in the employer is still relevant to the inquiry into employer-employee relationship, the Marcus case, supra, noted that there are various situations in which the test of control actually exercised does not emerge as the dispositive factor. Thus, the requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be done and the capabilities of the particular person doing it. Patently, where the type of work to be done requires little supervision over details for its proper prosecution "and the person performing it is so experienced that instructions concerning such details would be superfluous, a degree of supervision no greater than that which is held to be normally consistent with an independent contractor status might be equally consistent with an employment relationship. In such a situation the factor of control becomes inconclusive * * *." Marcus v. Eastern Agricultural Ass'n, supra, 58 N.J. Super., at p. 597.
The work place of petitioner in respondent's establishment, the work of petitioner being that customarily provided in such a salon, the weekly payments to petitioner, the continuing relationship for an indefinite duration, and the right of each to terminate the arrangement at will, are among the factors that support employee status. The fact of no payroll deductions for withholding taxes suggests independent *406 contractor status, but this factor was de-emphasized in Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 290 (App. Div. 1958), which held that the claimant was respondent's employee, notwithstanding the fact that respondent made no deductions from money paid claimant for income taxes or social security.
The word "employee" in the Workmen's Compensation Act is defined most broadly to include "all natural persons * * * who perform service for an employer for financial consideration, exclusive of casual employments, * * *." N.J.S.A. 34:15-36. The term "employee" must not be accorded a constrictive or mechanical definition but rather one geared to comport with the specific statutory purpose. Marcus v. Eastern Agricultural Ass'n, supra, 58 N.J. Super., at p. 602. The Workmen's Compensation Act "is construed to bring as many cases as possible within its coverage." Hannigan v. Goldfarb, 53 N.J. Super. 190, 195 (App. Div. 1958).
The test laid down in Marcus, supra, 58 N.J. Super., at p. 603 is "essentially an economic and functional one, and the determinative criteria not the inconclusive details of the arrangement between the parties, but rather the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." (Emphasis added.) This is what constitutes the "relative nature of the work test." We find it applicable here.
This test was approved in Hannigan v. Goldfarb, supra, in which a taxicab driver was held to be the employee of the taxicab owner under a "three-phase arrangement" whereby under the first phase Hannigan (the driver) was required to pay Goldfarb (the owner) $8 for each 12-hour shift he drove the cab; the second phase permitted Hannigan to retain all fares and tips; and the third phase required Hannigan to pay for all gas and oil used while he was in possession of the cab.
*407 The totality of the facts surrounding the relationship determines the status of one as an employee. The petitioner's economic dependence here upon the respondent is emphasized by the fact that the greater number of customers serviced by petitioner were produced by respondent under appointments made by the latter and, in large measure, as an ostensible integral part of respondent's business. The facial treatments became an integral part of respondent's business. Thus, in the economic and functional sense, petitioner became respondent's employee by reason of her dependence upon him for appointments made; by his supply of the bulk of the customers; by her utilization of his facilities on those days and those hours only when he chose to keep his salon open; by her lack of freedom to select her customers or the times when she would perform her ministrations; by her activity in selling his cosmetics at a commission; by her performance with his knowledge of incidental, though not required, services for him; by the use of his charge slips in billing customers to whom she gave facials; by his receipt and disbursement of payments for facials; by his control of the common phone; by her lack of any independent phone; by his not even giving her a key to the premises; by his dominance of the outside signs indicating the entire operation within was his alone; by his ability to terminate the relationship at will, as an employer might fire an employee at any time; and by the intertwining of her work with his in the operation of his business.
The mere fact that petitioner brought her own equipment,  chair, table and vibrator,  and actually controlled this equipment did not ipso facto preclude her being an employee. See Marcus case, supra, 58 N.J. Super., at p. 600, and Piantanida v. Bennett, 17 N.J. 291 (1955).
We do not agree with the Deputy Director that the respondent's contention, that his arrangement with petitioner was a "rental agreement," was as reasonable a conclusion as to the nature of the relationship between the parties as that of the petitioner. It is noteworthy that the County *408 Court did not conclude that the relationship between the parties was that of landlord and tenant. Nor do we. It is inconceivable that the parties by their arrangement intended that they were entering into a mere rental agreement. The over-all fact pattern does not support respondent's contention that petitioner was merely his tenant.
One more fact requires comment. After the accident, the petitioner consulted her present attorney. He filed a negligence action on her behalf against the respondent on February 24, 1958 in the Superior Court, Law Division, Morris County, which is still pending. Her claim petition against respondent for workmen's compensation was filed in October 1958. These inconsistent proceedings suggest doubt by the petitioner and her attorney as to the validity of her claim petition for workmen's compensation benefits. However, we cannot attribute too much weight to her theoretical admission against interest in the compensation proceeding, which may be drawn from her inconsistent suit at law, because the close question of legal relationship involved justifies the legal caution exercised. The beneficent purposes of the Workmen's Compensation Act may not be defeated by the double-barreled effort on petitioner's behalf. Public policy precludes a waiver of workmen's compensation except in the limited ways set forth in the statute, and not applicable here.
It is our view, therefore, that petitioner was an employee of respondent at the time of the accident for which she seeks compensation and that the accident arose out of and during the course of her employment. Since the parties have stipulated the quantum of workmen's compensation benefits to be paid upon a finding of employee status, the judgment is reversed and the case is remanded for further proceedings consistent herewith.