NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4034-14T4

KEYKO GIL, Individually and
as Guardian ad Litem for the APPROVED FOR PUBLICATION
infant KENNETH GIL,
 June 19, 2017
 Plaintiffs-Appellants,
 APPELLATE DIVISION
 v.

CLARA MAASS MEDICAL CENTER,

 Defendant-Respondent,

 and

HUSEYIN COPUR, M.D., and FIRSTCHOICE
OB-GYN LLC,

 Defendants,

 and

EXECUTIVE RISK SPECIALTY INSURANCE
COMPANY; LEXINGTON INSURANCE
COMPANY; ENDURANCE SPECIALTY
INSURANCE COMPANY, LTD; FIRST
SPECIALTY INSURANCE COMPANY; and
STEADFAST INSURANCE COMPANY,

 Defendants-Respondents.
______________________________________________________

 Argued December 6, 2016 – Decided June 19, 2017

 Before Judges Fisher, Ostrer and Vernoia
 (Judge Ostrer concurring).
 On appeal from the Superior Court of New
 Jersey, Law Division, Essex County, Docket No.
 L-8434-11.

 David A. Mazie argued the cause for appellants
 (Mazie Slater Katz & Freeman, LLC, attorneys;
 Mr. Mazie and David M. Estes, on the brief).

 Lauren M. Strollo argued the cause for
 respondent, Clara Maass Medical Center
 (Vasios, Kelly & Strollo, P.A., attorneys; Ms.
 Strollo, of counsel; Douglas M. Singleterry,
 on the brief).

 Katherine E. Tammaro argued the cause for
 respondent Executive Risk Specialty Insurance
 Company (Tressler LLP, attorneys; Ms. Tammaro,
 of counsel; Ms. Tammaro and Kevin Sullivan,
 on the brief).

 Michael J. Rossignol argued the cause for
 respondents Lexington Insurance Company,
 Endurance Specialty Insurance, LTD., First
 Specialty Insurance Company and Steadfast
 Insurance Company (Riker Danzig Scherer Hyland
 & Perretti LLP, attorneys; Mr. Rossignol, of
 counsel and on the brief; Brooks H. Leonard,
 on the brief).1

 John T. Coyne argued the cause for respondents
 Endurance Specialty Insurance, Ltd., and First
 Specialty Insurance Corporation (McElroy,
 Deutsch, Mulvaney & Carpenter, LLP, attorneys;
 Mr. Coyne, of counsel and on the brief).

 Kevin T. Coughlin argued the cause for
 respondent Steadfast Insurance Company
 (Coughlin Duffy, LLP, attorneys; Julia C.
 Talarick, of counsel and on the brief).

 The opinion of the court was delivered by

1
 These respondents, and those respondents whose appearances follow
above, filed a joint brief. The brief's authors from each law firm
are noted in their firm's separate appearances.

 2 A-4034-14T4
FISHER, P.J.A.D.

 In this appeal, we examine clauses contained in insurance

policies covering a hospital to determine, among other things,

whether the trial judge erred in rejecting plaintiffs' arguments

that an allegedly negligent physician was also covered because he

was the hospital's "employee" or a "leased worker," or because his

limited liability company was "affiliated or associated" with the

hospital. We conclude the policy language could not be plausibly

interpreted to provide coverage to the physician or his limited

liability company, and affirm.

 I

 In 2011, plaintiff Keyko Gil, on her own behalf and for her

infant child, Kenneth, commenced this medical malpractice action

against Huseyin Copur, M.D., FirstChoice OB/GYN LLC, and Clara

Maass Medical Center, alleging that Kenneth's birth defects were

caused by an emergency Caesarian section performed by Dr. Copur

at Clara Maass in 2004. At the time of the procedure, Dr. Copur

was purportedly acting in accordance with a services agreement

between Clara Maass and FirstChoice; the latter was an entity

formed by Dr. Copur and another physician.

 By motion, the trial judge capped Clara Maass's exposure at

$250,000, pursuant to the Charitable Immunities Act, N.J.S.A.

 3 A-4034-14T4
2A:53A-1 to -11, and denied without prejudice plaintiffs' motion

to declare Dr. Copur an employee of Clara Maass. The judge,

however, granted plaintiffs leave to file an amended complaint and

later permitted another amendment by which plaintiffs sought

relief on their own behalf, and as assignees of Dr. Copur and

FirstChoice,2 against defendant Executive Risk Specialty Insurance

Company, which issued a policy to Saint Barnabas Health Care

System3 covering its "employees," and against defendants Lexington

Insurance Company, Endurance Specialty Insurance, Ltd., First

Specialty Insurance Company, and Steadfast Insurance Company,

which provided excess insurance.4 The trial judge later severed

2
 Dr. Copur and FirstChoice's insurer paid plaintiff its $1,000,000
policy limit "in exchange for any alleged rights under the subject
policies and the agreement that plaintiff [would] not seek to
execute on the assets" of Dr. Copur or FirstChoice beyond that
policy limit.
3
 Clara Maass is part of the St. Barnabas system.
4
 Specifically, the primary coverage consisted of Clara Maass's
self-insured retention of $1,000,000, followed by Executive Risk's
policy, which provided $7,000,000 in coverage, and Lexington's
policy, which provided $25,000,000 in coverage. Excess coverage,
which followed the form of Lexington's policy, consisted of:
$25,000,000 provided by Endurance Specialty; $15,000,000 provided
by First Specialty; $20,000,000 provided by Steadfast; and
$15,000,000 provided by Executive Risk.

 4 A-4034-14T4
the coverage claims from the medical negligence claim, pending

disposition of the former.5

 Following the entry of summary judgment on the coverage issues

in the insurers' favor, plaintiffs filed this appeal, posing issues

about the interpretation of the relevant policies. Because summary

judgment was entered, we employ the familiar Brill6 standard which

the trial judge was also required to apply. See Townsend v. Pierre,

221 N.J. 36, 59 (2015).

 II

 In ascertaining whether the policies provided coverage for

either Dr. Copur or FirstChoice or both, we first consider that

the policies expressly covered "named insured[s]." FirstChoice and

5
 Because there has been no final disposition of the malpractice
claims, plaintiffs' appeal concerns only interlocutory orders and
required our leave to appeal. Grow Co. v. Chokshi, 403 N.J. Super.
443, 457-61 (App. Div. 2008). We would have, however, likely
granted leave to appeal in this situation had it been requested;
consequently, we choose to exercise our discretion in favor of
reviewing these interlocutory orders now rather than await final
disposition of all issues in the trial court. See General Motors
Corp. v. City of Linden, 279 N.J. Super. 449, 455-56 (App. Div.
1995), rev’d on other grounds, 143 N.J. 336, cert. denied, 519
U.S. 816, 117 S. Ct. 66, 136 L. Ed. 2d 27 (1996).
6
 Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

 5 A-4034-14T4
Dr. Copur, however, were not specifically listed in any of the

policies as "named insureds."7

 The Executive Risk policy, however, also defined "insured"

as including not only those expressly "named" but also "any

[e]mployee or [v]olunteer." Since it has not been argued that Dr.

Copur was a volunteer, we turn to that part of the policy that

defined an "employee" as

 any person who has an assigned work schedule
 for and is on the regular payroll of the Named
 Insured, with federal and state taxes
 withheld. Independent contractors are not
 Employees. An Employee's status as an Insured
 shall be determined as of the date of the
 Occurrence or Wrongful Act upon which a Claim
 involving the Employee is based.

 The Lexington policy – which was followed, as to its form,

by the other excess insurers – also included coverage for Clara

Maass's "employees" "but only for acts within the scope of their

employment . . . or while performing duties related to the conduct

of [Clara Maass's] business." The word "employee" is defined in

that policy as "a person paid by [Clara Maass] in connection with

[its] business." The word "employee" does not include "a temporary

7
 The list of named insureds also includes a "catch-all" provision
that encompasses "any owned or controlled subsidiary, associated
or affiliated company, corporation, partnership OR entity as now
exists of may hereafter be constituted, acquired or formed."

 6 A-4034-14T4
worker[8] or independent contractor,[9]" but does include "a leased

worker," which was described as "a person leased to [the named

insured] by a labor leasing firm, under an agreement between [the

named insured] and the labor leasing firm, to perform duties

related to the operations as described in the Declarations and

which are at [the named insured's] direction."

 III

 In granting summary judgment in favor of the insurers through

his reading of the policy provisions quoted above, the trial judge

rejected plaintiffs' arguments: (a) that Dr. Copur was an

"employee," (b) that either Dr. Copur or FirstChoice fell within

the terms of the "catch-all" provisions, or (c) that Dr. Copur was

a "leased worker." We separately consider these arguments. But,

before that, we observe that although, as summary-judgment

movants, the insurers were required to demonstrate the absence of

a genuine dispute of all material facts, Brill, supra, 142 N.J.

at 540, the ultimate burden of persuasion rested with plaintiffs,

who stood in the shoes of Dr. Copur and FirstChoice on these

8
 "[T]emporary worker" was defined as "a person who is furnished
to [the named insured] to substitute for a permanent employee on
leave or to meet seasonable or short-term work load requirements."
9
 "[I]ndependent contractor" was not defined.

 7 A-4034-14T4
issues,10 to show the policies provided coverage. See Wakefern Food

Corp. v. Liberty Mut. Fire Ins. Co., 406 N.J. Super. 524, 538

(App. Div.), certif. denied, 200 N.J. 209 (2009); Polarome Int'l,

Inc. v. Greenwich Ins. Co., 404 N.J. Super. 241, 258 (App. Div.

2008), certif. denied, 199 N.J. 133 (2009).

 A

 The parties' debate goes so far as to question how we should

determine whether Dr. Copur was an employee for purposes of the

insurance policies in question. Plaintiffs invite us to look to

common-law principles regarding what it means to be an employee

or independent contractor. The insurers urge that we stick to the

plain meaning of the words and phrases employed without straying

into other areas where societal policies require an alternate

view. In this circumstance, we agree with the insurers but will

nevertheless discuss both approaches.

 (1)

 The policies expressly defined an "employee" as a person who

is paid by the named insured, here Clara Maass. The Executive Risk

policy is very explicit in this regard, defining an employee within

the meaning of that policy as "any person who has an assigned work

10
 Elat, Inc. v. Aetna Cas. & Sur. Co., 280 N.J. Super. 62, 67
(App. Div. 1995).

 8 A-4034-14T4
schedule for and is on the regular payroll of the Named Insured,

with federal and state taxes withheld." Dr. Copur testified at his

deposition that he was not an employee, and it is undisputed that

he was not on Clara Maass's "regular payroll."

 The other policies do not define the term "employee" by

insisting upon that person being on the named insured's "regular

payroll" but nevertheless require that the purported "employee"

be "a person paid by [Clara Maass] in connection with [its]

business." Again, there is no dispute that Dr. Copur was not paid

by Clara Maass; FirstChoice was compensated by Clara Maass,11 and

Dr. Copur was paid by FirstChoice.

 Undaunted, plaintiffs argue that even in the absence of

evidence that Dr. Copur was paid by Clara Maass, other indicia of

the relationship suggested that Dr. Copur was not an "independent

contractor," which none of the policies defined. In other words,

because "independent contractor" was not defined, plaintiffs argue

that evidence tending to show Dr. Copur did not fit the common-

law understanding of an "independent contractor" would, a

fortiori, demonstrate his status as an "employee." We are not

persuaded. Because the word "employee" is defined by reference to

11
 Plaintiffs have not argued that FirstChoice was an "employee"
for purposes of any of these insurance policies.

 9 A-4034-14T4
specific attributes and "independent contractor" is not defined

at all, we reject plaintiffs' syllogism.

 General rules of interpretation require that, so long as it

leads to a result in harmony with the contracting parties' overall

objective, a specific, defined term controls a general, undefined

term. See Bauman v. Royal Indem. Co., 36 N.J. 12, 22 (1961); George

M. Brewster & Son, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 35

(1954); Burley v. Prudential Ins. Co., 251 N.J. Super. 493, 500

(App. Div. 1991). "Specific language in a contract controls over

general language, and where specific and general provisions

conflict, the specific provision ordinarily qualifies the meaning

of the general." DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d

954, 961 (Del. 2005). "Even absent a true conflict, specific words

will limit the meaning of general words if it appears from the

whole agreement that the parties' purpose was directed solely

toward the matter to which the specific words or clause relate."

11 Williston on Contracts § 32.10, at 744 (4th ed. 2012).

 Contrary to plaintiffs' contentions, we must first ascertain

whether Dr. Copur meets the policy's specific definition of what

it means to be an "employee" for purposes of insurance coverage.

If he does not meet that definition, we may then conclude he was

 10 A-4034-14T4
an independent contractor.12 We should not, as plaintiffs argue,

determine whether Dr. Copur is an independent contractor and, if

not, conclude he must be an employee even if he does not possess

the one attribute the contracting parties obviously viewed as

controlling – whether he was paid by Clara Maass.

 Moreover, we reject an even more basic premise to plaintiffs'

argument – their contention that we must look to definitions of

"employee" and "independent contractor" contained in the common

law or as defined by or consonant with remedial legislation. We

must not forget we are construing a contract created by

sophisticated parties. The insurance policies in question do not

remotely suggest that we should look to principles of law

applicable to different circumstances as a means for ascertaining

the meaning of the policies' terms. The contracting parties had a

particular understanding that Clara Maass "employees" should be

covered but that the attributes of an employee were specific and

were not to be broadened by resort to common-law principles applied

12
 In short, an individual in this situation can fit only two
categories – employee or independent contractor – and that if he
fell within one he cannot fall within the other and vice versa.
We recognize the policies suggest other possibilities, i.e.,
volunteer, temporary worker, and leased worker. But there is no
dispute that Dr. Copur was not a volunteer or temporary worker,
and we find no merit, as discussed later, in the argument that he
was a leased worker. Consequently, we approach the immediate
problem as questioning only whether Dr. Copur was an employee and,
if not, he was an independent contractor.

 11 A-4034-14T4
in other circumstances, particularly those principles and policies

that call for a broad or liberal interpretation of the term. For

example, the word "employee" has been defined broadly when

determining whether an individual was entitled to the benefits of

the workers' compensation statutes, the Conscientious Employee

Protection Act, N.J.S.A. 34:19-1 to -14, and the Tort Claims Act

(TCA), N.J.S.A. 59:1-1 to 12-3. See Lippman v. Ethicon, Inc., 222

N.J. 362, 379 (2015); D'Annunzio v. Prudential Ins. Co. of Am.,

192 N.J. 110, 126-27 (2007); Lowe v. Zarghami, 158 N.J. 606, 617-

18 (1999). In those instances, public policy and the remedial

nature of the underlying social legislation "dictate[d] a more

liberal standard." Id. at 618. Those same societal interests are

not at play here.

 In short, we decline the invitation to interpret the parties'

expressions of what it means to be an "employee" for their purposes

as if those insurance policies stated:

 Your "employees" are covered, "independent
 contractors" are not; the terms "employee" and
 "independent contractor" are to be defined by
 and construed in accordance with New Jersey
 common law.

That is not a plausible interpretation of these policies.

 12 A-4034-14T4
 (2)

 Having rejected plaintiffs' proposed methodology for

interpreting these policies, for the sake of completeness we

examine plaintiffs' argument that Dr. Copur was not an independent

contractor within the meaning of the common law. In their

description of the common-law approach, plaintiffs correctly

observe that our courts use "two different tests to distinguish

employees from independent contractors," i.e., the "control test"

and the "relative nature of work test." Lowe, supra, 158 N.J. at

615-16.

 The "control test" requires consideration of four factors:

"(1) the degree of control exercised by the employer over the

means of completing the work; (2) the source of the worker's

compensation; (3) the source of the worker's equipment and

resources; and (4) the employer's termination rights." Id. at 616.

A worker's status as an employee can "often be solidly proved on

the strength of one of the four items." Tofani v. LoBiondo Bros.

Motor Express, Inc., 83 N.J. Super. 480, 486 (App. Div.), aff'd

o.b., 43 N.J. 494 (1964). The Supreme Court described the

relationship of the "control test" with the "relative nature of

work test":

 If the court determines that a person is an
 employee under the control test, then the
 inquiry ends there. If, however, the control

 13 A-4034-14T4
 test is inconclusive, then the court must
 determine whether it is appropriate to apply
 the relative nature of the work test.

 [Lowe, supra, 158 N.J. at 618.]

The "relative nature of the work test" calls for an examination

of "the extent of the economic dependence of the worker upon the

business he serves and the relationship of the nature of his work

to the operation of that business." Marcus v. Eastern Agricultural

Ass'n, 58 N.J. Super. 584, 603 (App. Div. 1959) (Conford, J.A.D.,

dissenting), rev'g on dissent, 32 N.J. 460 (1960); see also Lowe,

supra, 158 N.J. at 616. When "the working relationship" – like

here – "involves professional services where an employer cannot

exercise control over the methods used to provide those services,

the relative nature of the work test may provide a more accurate

assessment of the working relationship." Id. at 618.

 Application of the "control test" overwhelmingly precludes a

finding that Dr. Coper was an employee. As we have already

observed, Dr. Copur was not paid by Clara Maass, and Clara Maass

had no control over Dr. Copur's efforts on behalf of the patient,

even though FirstChoice's contractual arrangement with Clara Maass

called for Dr. Copur's compliance with Clara Maass's bylaws and

 14 A-4034-14T4
regulations.13 And the use by Dr. Copur of any equipment provided

by Clara Maass was purely incidental to his treating of patients.

It may be true, in considering the test's fourth aspect, that

Clara Maass was entitled to prevent Dr. Copur from practicing

medicine in its facility, but, in the final analysis, the control

test has no application to the relationship between Dr. Copur and

Clara Maass because his services on behalf of patients were not

guided by Clara Maass but by the doctor's own knowledge, experience

and judgment. As the Court recognized in Lowe, "it would be

inconsistent with the nature of a physician's work for [the]

employer to dictate the details of how [to] perform[] the practice

of medicine . . . [as] control is 'inimical to the task to be

performed,' since the nature of the work depends upon the

professional's independent exercise of judgment." 158 N.J. at 618-

20 (quoting Delbridge v. Office of Pub. Def., 238 N.J. Super. 288,

322 (Law Div. 1989)). Dr. Copur could not be viewed as an employee

under the control test.

 We also agree with the trial judge's rejection of the

contention that the "relative nature of the work" test required a

13
 As observed in Lowe, the fact that Clara Maass exercised control
by rules applicable to "paperwork and other administrative
procedures," does not mean Clara Maass did or could exercise
"control over the way in which [Dr. Copur] operated on [a patient,]
or [the selection of Dr. Copur's] choice of treatment." 158 N.J.
at 619.

 15 A-4034-14T4
finding that Dr. Copur was a Clara Maass employee. To repeat, we

emphasize there is nothing about the policy language that would

suggest an intention to apply this common law test as the means

for ascertaining whether a particular individual was covered by

the policies. But, even if we were to conclude otherwise, we find

the "relative nature of the work" test does not support an argument

that Dr. Copur was a Clara Maass employee.

 This test has been used either as the means for determining

whether an individual is entitled to workers' compensation

coverage or whether an individual should be deemed a public

employee for TCA purposes. Lowe, supra, 158 N.J. at 617. For those

purposes, the test considers both economic dependence and "whether

the goals of the business are served by concluding that the

particular worker is an employee." Id. at 622. Lowe, which

considered the application of this test to a physician – but for

the purpose of determining whether he was a public employee

entitled to TCA immunities – nevertheless found the physician to

be an employee because he was "totally economically dependent on

UMDNJ and his work constituted an integral part of UMDNJ's

business." Id. at 623.

 The record does not reveal the same degree of economic

dependence here as in Lowe. First, as we have repeatedly mentioned,

Clara Maass did not pay Dr. Copur. In addition, Dr. Copur and

 16 A-4034-14T4
FirstChoice did not have offices at Clara Maass. And Dr. Copur and

FirstChoice could and did engage in the practice of medicine

outside the aegis of Clara Maass; in that regard, Dr. Copur

testified at a deposition that he had privileges at Hackensack

Hospital. Application of the second aspect of this test – "the

relationship of the nature of [the alleged employee's] work to the

operation of that business," id. at 616 – considers whether the

alleged employer's business goals would be promoted by the

individual's status as an employee. Id. at 622-23. Plaintiffs'

claim that this test applied here is belied by the fact that the

agreement between Clara Maass and FirstChoice did not require the

former to provide professional liability insurance for the latter.

And Clara Maass' business goal included a reduction of malpractice

exposure, the reduction of insurance costs, and an avoidance of

depletion of its self-insurance fund. Dr. Copur was, in essence,

a "house" physician14 for Clara Maass' clinic, which offered

services to patients of limited means. Increasing the costs of

these services through a finding that Dr. Copur, or other

physicians similarly situated, are entitled to be treated, for

insurance purposes, as Clara Maass employees would likely increase

the costs associated with operating the clinic.

14
 In essence, being "available for emergencies."

 17 A-4034-14T4
 For all these reasons, we reject plaintiffs' argument that

Dr. Copur was a Clara Maass employee.

 B

 Plaintiffs also argue that FirstChoice falls within the so-

called "catch-all" provision. We, again, disagree.

 This argument centers around provisions in the Executive Risk

and Lexington policies that incorporate a list of "named insureds"

which, along with those specifically named, includes coverage for:

 [a]ny owned or controlled subsidiary,
 associated or affiliated company,
 corporation, partnership or entity as now
 exists OR who may hereafter be constituted,
 acquired or formed.

Plaintiffs argue that this provision is ambiguous – that it is

susceptible to more than one plausible interpretation, Chubb

Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238

(2008) – chiefly because, according to plaintiffs, individuals

involved in underwriting this policy "admitted that it is

ambiguous." Plaintiffs also contend that, because the phrase

"associated or affiliated company" is not defined in the policy,

a question of fact is presented as to whether a particular entity

is associated or affiliated with Clara Maass.

 We reject plaintiffs' argument that "[t]he underwriter who

approved the catch-all provision admitted that it is ambiguous."

 18 A-4034-14T4
In this regard, plaintiffs mainly rely on the underwriter's

deposition testimony where she expressed that she "did not

completely understand at the time – what they were intending." We

don't agree that this or any of her other testimony constituted

an admission that the catch-all phrase was ambiguous. Instead, the

deposition testimony – to the extent the underwriter's personal

view of the policy's meaning has relevance – reveals that the

catch-all provision did have for her a clear purpose, i.e., to

incorporate as a named insured any entity that might have been

omitted from the list of numerous entities that the principal

named insured wanted covered. As the underwriter explained, the

named insured basically presented a list of those entities then

insured and sought inclusion of language in the policy that would

provide coverage for any entity "inadvertently left off" the list;

in short, the underwriter described the catch-all provision as "a

belt and suspenders" provision.

 To be sure, the underwriter's description of what was intended

is not entirely clear. But her testimony does not support

plaintiffs' declaration that the underwriter "admitted" the phrase

is "ambiguous." Even viewed expansively, we consider this

deposition testimony as revealing only an intent to include those

entities on a list of organizations and other similar organizations

 19 A-4034-14T4
that might have been overlooked or might come into being during

the coverage period.

 Moreover, any uncertainties expressed by the underwriter or

others cannot convert the plain ordinary meaning of the policies'

words and phrases into something doubtful and ambiguous. In

interpreting insurance policies, we give words and phrases their

ordinary meaning. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595

(2001). In seeking relief, it is noteworthy that plaintiffs do not

provide what they believe is another plausible interpretation but,

instead, suggest only the presence of a genuine factual dispute

about the catch-all provision's scope because its terms are

undefined. The lack of a definition, however, does not, as

plaintiffs argue, "automatically" create an ambiguity. Priest v.

Roncone, 370 N.J. Super. 537, 544 (App. Div. 2004); see, e.g.,

Boddy v. Cigna Prop. & Cas. Cos., 334 N.J. Super. 649, 656-57

(App. Div. 2000).

 Despite plaintiffs' failure to suggest a plausible

interpretation that might be applied to create coverage for

FirstChoice under the policies, we nevertheless examine the catch-

all provision in search of ambiguity.

 We start with the fact that plaintiffs do not, because they

cannot, dispute that FirstChoice does not fit much of the

descriptive words contained in the catch-all phrase; FirstChoice

 20 A-4034-14T4
was not an "owned or controlled subsidiary" of Clara Maass, and

it was not later "constituted, acquired or formed."

 We also agree with the insurers that FirstChoice was not an

"associated or affiliated company." The latter part of this phrase

– "affiliated company" – has no application because that phrase

is ordinarily understood as conveying some degree of ownership or

control by the insured over the so-called "affiliated company."

That is, an "affiliate" is understood to be a "corporation that

is related to another corporation by shareholdings or other means

of control; a subsidiary, parent, or sibling corporation." Black's

Law Dictionary 69 (10th ed. 2014).15

 Although of less certain meaning, the phrase "associated

company" should be understood as connoting something similar to

"affiliated company" pursuant to our familiar interpretive guides.

For example, it is well understood that "the meaning of words may

be indicated and controlled by those with which they are

associated." Germann v. Matriss, 55 N.J. 193, 220 (1970); see also

Shelton v. Restaurant.com, Inc., 214 N.J. 419, 440 (2013). As

15
 We recognize this edition of Black's Law Dictionary was published
after the policies were formed. Earlier editions in existence at
that time, however, also insisted that an "affiliated company" be
"related to another corporation by shareholding or other means of
control," Black's Law Dictionary 59 (7th ed. 1999), or owned or
"effectively controlled by another company," Black's Law
Dictionary 58 (6th ed. 1990).

 21 A-4034-14T4
particularly relevant in the insurance world – where scriveners

often use series of similar words and phrases as the means of

reaching or ensuring a particular goal – "words of a feather flock

together." Consequently, we reject the contention that the phrase

"associated company" may be given a far greater scope than its

neighboring phrases – "owned or controlled subsidiary," and

"affiliated company" – were intended to encompass. In short, we

find implausible an interpretation that the catch-all provision

was meant to include an entity having no relation other than the

fact that it entered into an arms-length contract with a named

insured. Were we to interpret the provision as broadly as

plaintiffs would suggest, the policy would conceivably include

coverage for entities that provide janitorial services or garbage

removal to the named insureds. As a result, we conclude that the

phrase "associated company" requires some ownership link between

the named insured and the alleged "associated company." 16 Only in

that way, could this term be harmonized with its neighboring words

and phrases. Any other conclusion would be inconsistent with the

words utilized by the parties in defining their rights and

obligations.

16
 Clara Maass refers to www.investopedia.com, where "associate
company" is defined as an entity whose parent company "owns only
a minority stake of the corporation, as opposed to a subsidiary
company, where a majority stake is owned."

 22 A-4034-14T4
 C

 Plaintiffs lastly contend that the policies cover Dr. Chopur

because he was a "leased worker." We disagree with this as well.

 We initially observe that the judge determined plaintiffs

failed to comply with their discovery obligations, as required by

Rule 4:17-7, by failing to identify this "leased worker" argument

in response to interrogatories. Because we find no merit in the

"leased worker" argument, we need not reach this discovery issue.

 The policy definition of "employee," as mentioned earlier,

"includes a leased worker," which is defined as "a person leased

to [the named insured] by a labor leasing firm, under an agreement

between [the named insured] and the labor leasing firm, to perform

duties related to the operations as described in the Declarations

and which are at [the named insured's] direction."17 Key to a

determination of whether Dr. Copur was a "leased worker" is whether

FirstChoice was a "labor leasing firm." As understood in this

context, a "labor leasing firm" is

 a company in the business of placing its
 employees at client companies for varying
 lengths of time in exchange for a fee. In other
 words, a "labor leasing firm" is a business
 concern that sells another person's work for
 a specified time and for a specified fee.

17
 We also previously observed that this definition expressly
excludes "a temporary worker or independent contractor."

 23 A-4034-14T4
 [Telamon Corp. v. Charter Oak Fire Ins. Co.,
 850 F.3d 866, 870 (7th Cir. 2017) (quotations
 and citations omitted).]

This definition does not turn on how the agreement between the

alleged lessor and lessee is labeled, i.e., the contract between

Clara Maass and FirstChoice need not have been described by them

as a "lease" in order to be encompassed. Scottsdale Ins. Co. v.

Torres, 561 F.3d 74, 78 (1st Cir. 2009).

 But the application of this provision does depend on whether

FirstChoice was in the business of leasing its employees to others.

The record amply demonstrates that FirstChoice was an entity by

and through which its member physicians practiced medicine.

Although it provided physicians to perform certain services on

Clara Maass's behalf for specific compensation, there is no

evidence to suggest this was FirstChoice's sole or chief reason

for existing. As the record reveals, FirstChoice had offices in

Lyndhurst where its physicians saw and treated patients outside

Clara Maass's auspices and control. And to the extent its agreement

with Clara Maass might be assumed to be a leasing agreement, it

has not been shown that FirstChoice had any similar agreements

with any other entities. We, thus, reject the argument that

FirstChoice is a labor leasing firm.

 In addition, for there to be coverage, it is still not enough

to determine that FirstChoice was a labor leasing firm. Plaintiffs

 24 A-4034-14T4
were also required to show, as the provision demands, that the so-

called "leased worker" performed services for the company to which

he was leased "at [the named insured's] direction." Our earlier

determination – that Dr. Copur did not meet the "control test" –

leads us also to conclude that he did not perform services at the

hospital at Clara Maass's direction; instead, he was chiefly guided

by his own professional judgment in the rendering of treatment to

the hospital's patients.

 Dr. Copur could not be considered a "leased worker" within

the meaning of the policies in question.

 IV

 We lastly note that plaintiffs have argued the judge erred

in dismissing their estoppel claims. We find insufficient merit

in that argument to warrant further discussion in a written

opinion. R. 2:11-3(e)(1)(E).

 For all these reasons, we find no merit in plaintiffs'

arguments that the insurance policies in question provide coverage

for either Dr. Copur or FirstChoice.

 Affirmed.

 25 A-4034-14T4
_______________________________

OSTRER, J.A.D., concurring.

 I concur in the court's judgment and join in all but part

III(A)(2) of its opinion. This is an insurance coverage case.

The issue before the court is whether Dr. Copur was an insured

under any of Clara Maass's policies. These policies covered

employees, but not independent contractors off the payroll. So,

the task turned to ascertaining whether Dr. Copur was an

"employee."

 Plaintiff made a fundamental error in contending the control

test and relative nature of the work test inform the meaning of

the policy term. As the court ably explains, plaintiff was looking

for the definition of "employee" in the wrong place. The answer

lies in the language of the insurance agreements, in particular,

their definition of "employee." The parties to the policy were

free to include, or not, a variety of persons who labor in the

hospital. In this case, Dr. Copur and other independent

contractors not on the payroll were left out. Thus, it is

irrelevant whether Dr. Copur satisfied common law definitions of

an employee, either by the control test or by the relative nature

of the work test.

 In a variety of legal settings, courts have grappled with

whether a worker is an "employee." The answer affects workers'
entitlements and companies' obligations under remedial social

legislation and third-party rights to compensation. See, e.g.,

Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440,

444-51, 123 S. Ct. 1673, 1677-81, 155 L. Ed. 2d 615, 623-27 (2003)

(applying the common law definition of employee in a case involving

Americans with Disabilities Act where Congress did not expressly

define the term); Estate of Kotsovska ex rel. Kotsovska v. Liebman,

221 N.J. 568 (2015) (adopting a "hybrid" approach for determining

a worker's status under the Workers' Compensation Act); Hargrove

v. Sleepy's, LLC, 220 N.J. 289 (2015) (concluding that an employee

under the Wage Payment Law should be defined according to the so-

called "ABC test" under N.J.S.A. 43:21-19(i)(6)); Basil v. Wolf,

193 N.J. 38, 63-66 (2007) (utilizing a control test to determine

that an insurer was not vicariously liable for the negligence of

the physician it hired to examine a claimant); Lowe v. Zarghami,

158 N.J. 606, 614-24 (1999) (applying relative nature of the work

test to determine that a physician under the circumstances was a

public "employee" for purposes of the Tort Claims Act); Carpet

Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 125 N.J. 567, 580-

87 (1991) (applying the "ABC test" to determine whether carpet

installers' services constituted employment, making them eligible

for unemployment compensation).

 2 A-4034-14T4
 The analysis is context-specific. To determine whether a

worker is an employee, a court must look to the specific statute's

terms and purpose or the underlying goals of the common law

doctrine. See, e.g., D'Annunzio v. Prudential Ins. Co. of Am.,

192 N.J. 110, 122 n.7 (2007) (stating that "in each setting-

specific analysis, what matters most is that an individual's status

be measured in the light of the purpose to be served by the

applicable legislative program or social purpose to be served").

 In this case, the court's analysis lacks essential context.

Though the majority notes that its reasoning is dicta, I am

concerned it may be misread to indicate that, putting the insurance

coverage issue aside, Clara Maass should not be vicariously liable

for Dr. Copur's actions because, according to the majority, it

fails the control test and relative nature of work test. I am not

so sure. For example, I cannot agree that an obstetric surgeon's

use of a hospital's operating room is "purely incidental to his

treating of patients." However, I will not analyze each of the

factors that the majority considered, because my point is that we

need not, and indeed should not, go there.

 More broadly, I am wary of applying our traditional common

law standards to increasingly complex and novel workplace

relationships. Were Clara Maass's vicarious liability the issue,

we would also likely consider whether it should be grounded on

 3 A-4034-14T4
principles of apparent agency. See, e.g., Estate of Cordero ex

rel. Cordero v. Christ Hosp., 403 N.J. Super. 306, 312-18 (App.

Div. 2008); Arthur v. St. Peter's Hosp., 169 N.J. Super. 575, 581

(Law Div. 1979); see also Marjorie A. Shields, Annotation,

Liability of Hospital or Sanitarium for Negligence of Independent

Physician or Surgeon—Exception Where Physician Has Ostensible

Agency or "Agency by Estoppel", 64 A.L.R.6th 249 (2017);

Restatement (Second) of Torts § 429 (1965) ("One who employs an

independent contractor to perform services for another which are

accepted in the reasonable belief that the services are being

rendered by the employer or by his servants, is subject to

liability for physical harm caused by the negligence of the

contractor in supplying such services, to the same extent as though

the employer were supplying them himself or by his servants.").

 We might also consider whether the traditional control and

relative nature of work tests should be modernized to account for

the shift in the nature of workplace relationships in our society,

which affects far more than the hospital or, more broadly, the

health care sector. See U.S. Gov't Accountability Office, GAO-

15-168R, Contingent Workforce: Size, Characteristics, Earnings,

and Benefits, 4, 12 (2015) (available at

http://www.gao.gov/assets/670 /669766.pdf) (most broadly defined,

contingent workers — that is, "temporary, contract or other forms

 4 A-4034-14T4
of non-standard employment arrangements in which they may not

receive employer-provided retirement and health benefits, or have

safeguards such a job-leave under the Family Medical Leave Act" —

made up 35.3 percent of all employed workers in 2006 and 40.4

percent in 2010). No doubt, many workers desire independent

contractor or other non-standard employment relationships.

However, others are left with little choice but to accept them.

 Over fifty years ago, Judge Conford recognized the

limitations of the control test in workers compensation cases

where "it is not in the nature of the work for the manner of its

performance to be within the hiring party's direct control . . . ."

Marcus v. Eastern Agricultural Ass'n, 58 N.J. Super. 584, 597

(App. Div. 1959) (Conford, J.A.D., dissenting), rev'g on dissent,

32 N.J. 460 (1960). The nature of work is changing. The advent

of the so-called "gig economy," and the increasing use of

"independent contractors," threaten to leave growing numbers of

workers unprotected by the remedial statutes designed to shield

them from the vagaries of the workplace. See Miriam A. Cherry &

Antonio Aloisi, "Dependent Contractors" in the Gig Economy: A

Comparative Approach, 66 Am. U. L. Rev. 635 (2017); Orly Lobel,

The Gig Economy & The Future of Employment and Labor Law, 51 U.S.F.

L. Rev. 51, 61 (2017) (observing that, "in the Gig Economy, the

distinction between independent contractor and employee continues

 5 A-4034-14T4
to present definitional challenges and reveals the pervasive

practical difficulty in applying" traditional, multi-factor

tests). These new relationships also threaten to shield businesses

from liability for the harm those workers caused while laboring

on their behalf. Agnieszka A. McPeak, Sharing Tort Liability in

the New Sharing Economy, 49 Conn. L. Rev. 171, 188-215 (2016)

(describing how Uber and other companies in the "sharing economy"

that rely almost entirely on independent contractors present

challenges in the application of tort law). Scholars have

suggested that our common law needs to adapt in other ways to

assure compensation for wrongs committed by persons holding one

of these new positions. See, e.g., id. at 215-25.

 The traditional common law tests, as applied by the majority,

may prove to be anachronistic. But that may be remedied. After

all, "[o]ne of the great virtues of the common law is its dynamic

nature that makes it adaptable to the requirements of society at

the time of its application in court." State v. Culver, 23 N.J.

495, 505, cert. denied, 354 U.S. 925, 77 S. Ct. 1387, 1 L. Ed. 2d

1441 (1957). "The common law has always had the inherent capacity

to develop and adapt itself to current needs . . . ." Collopy v.

Newark Eye & Ear Infirmary, 27 N.J. 29, 43-44 (1958); see also

White v. N. Bergen Twp., 77 N.J. 538, 551-52 (1978). Another

court, facing this issue more squarely than our panel, should

 6 A-4034-14T4
consider whether the present circumstances warrant such an

adaptation.

 As it is, this case does not require that we apply the

traditional control test and relative nature of work test.

Therefore, I would not.

 7 A-4034-14T4