58 N.J. Super. 584 (1959)
157 A.2d 3
MURRAY MARCUS, PETITIONER-RESPONDENT,
v.
EASTERN AGRICULTURAL ASSOCIATION, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1959.
Decided December 28, 1959.
*587 Before Judges CONFORD, FOLEY and MINTZ.
Mr. Brian D. Conlan argued the cause for respondent-appellant (Messrs. Gurry and Conlan, attorneys).
Mr. William E. O'Connor, Jr., argued the cause for petitioner-respondent (Mr. Henry L. Gertner, of counsel).
MINTZ, J.C.C. (temporarily assigned).
This is a workmen's compensation case. The Division of Workmen's Compensation awarded petitioner compensation. The County Court affirmed. The respondent appeals. The sole issue on appeal is whether the testimony discloses that petitioner was an employee within the purview of N.J.S.A. 34:15-36.
It is the duty of this court to weigh the evidence adduced below and determine whether petitioner has sustained the burden of proving "employee" status by a preponderance of the evidence, giving full and respectful consideration *588 to the views expressed on both facts and law by the Division and County Court. Russo v. United States Trucking Corp., 26 N.J. 430 (1958).
Petitioner and his wife jointly own a chicken farm in Farmingdale, New Jersey. The respondent is engaged in the business of producing and selling eggs, and in raising laying chickens. Early in 1957 petitioner entered into an oral arrangement with respondent whereby he would raise chicks owned by respondent on his farm at a price of $10 a week per thousand chicks. Subsequently, the number of chicks on his premises averaged between 7,500 and 8,000, and a new arrangement was entered into orally whereby petitioner received a flat sum of $70, later increased to $75, a week for his services and facilities. Respondent made no deductions for social security, withholding, or any other tax.
On December 7, 1957 petitioner was working in the chicken building which consisted of "five big rooms and there were five stoves operating with chicks under the stoves." There was an explosion in one of the metal stoves, as a result of which he sustained multiple burns.
The feed for the chicks was supplied by the respondent. Its representative instructed petitioner how to feed the chicks, would advise medication, and call in a veterinarian when required. The advices were generally by telephone, although respondent's Mr. Boyarin came to the farm on an average of once a month. On one occasion respondent's representative instructed the petitioner to change the gas heating system, which he did at a cost of $12. Petitioner had no employees to assist him in his work, although he admitted that his wife helped him on occasion, working five hours for the entire week when required.
At the conclusion of the oral argument before us counsel, at the request of the court, stipulated certain facts not disclosed in the testimony, for inclusion in the record. The stipulation included the following: The petitioner purchased the farm on January 10, 1949 for $33,500, and that as of October 1, 1959 the mortgage balance amounted to *589 $10,136.33. The operating expenditures amounted to approximately $100 yearly for replacements and costs of repairs to equipment. The equipment on the farm, dates of acquisition and cost thereof are as follows:

 10 brooder stoves 3/15/49 @$35.00 $350
 100 8-ft. hoppers 9/2/49 @ 5.00 500
 100 2-ft. hoppers 3/15/49 @ .50 50
 100 4-ft. hoppers 2/10/53 @ .70 70
 600 holes  nests 1/5/54 @ 1.00 600
 600 holes  nests 5/10/49 @ 1.00 600
 30 feed buckets 3/15/49 @ .80 24
 60 chick jars 3/22/49 @ 1.50 90
 25 rings for brooding 5/10/49)
 2/8/51) @ 3.00 75
 20 chicken crates 5/10/54 @ 2.75 55

From the date petitioner made his arrangement with respondent until the date of the accident, the equipment above itemized was used exclusively for raising of chicks owned by respondent. A suit is presently pending against petitioner, instituted by a feed company, for $14,336.14, representing feed purchased by petitioner prior to his arrangement with respondent. The petitioner's farm contains 24 acres. Only approximately two acres were devoted to poultry-raising activities, and from January 1, 1956 to January 1, 1959 about ten acres were leased out for the raising of corn at an annual rental of $100. During said period no other kind of activity for profit was conducted on the farm. There were no other farm buildings or commercial equipment on the premises except that which the lessee brought on the farm in connection with his corn-raising activities. Petitioner and his wife occupied the residence. The balance of the land on the farm was not put to any use. Petitioner performed no work in connection with the raising of corn. Between January 1, 1956 and the spring of 1957 petitioner maintained poultry on the premises until one month before his arrangement with respondent, at *590 which time he sold the remainder of his flock with the intention of abandoning the poultry raising business.
The factual situation presents a case of novel impression in New Jersey.
In Hannigan v. Goldfarb, 53 N.J. Super. 190, 195 (App. Div. 1958), this court held that
"The term `employee' in our Workmen's Compensation Act is not limited to narrow common-law concepts for, in addition to servants, it `includes all natural persons * * * who perform service for an employer for financial consideration.' N.J.S.A. 34:15-36. This is a broad definition which includes relationships not ordinarily considered to constitute employment. Our act is construed to bring as many cases as possible within its coverage. * * *"
The rule applicable here, as in any case where the character of the relationship between the parties is in issue, is simply that it "* * * must be resolved by a balancing of the various elements presented by the entire complex of facts with which the court is confronted. The element of control is one most stressed in the cases." Piantanida v. Bennett, 17 N.J. 291, 294 (1955). The element of control is the "determinative factor" and the criterion by which each case is determined. Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261 (1953); De Monaco v. Renton, 18 N.J. 352 (1955). The status of the petitioner is to be resolved upon the totality of the facts surrounding the relationship, with due regard for the attendant circumstances, the object in view, and the course of practice in its execution. Hannigan v. Goldfarb, supra.
In Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481, 483 (E. & A. 1931), it was held that
"An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work."
Generally it may be said that where the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or *591 in other words, not only what shall be done, but how it shall be done, the relationship of employer and employee exists. Hannigan v. Goldfarb, supra; Errickson v. F.W. Schwiers, Jr., Co., supra.
When the manner of performing the service is beyond another's control because of its nature, absence of direct control over such details becomes insignificant in the over-all view of the facts and circumstances to be taken into account in determining the relationship. De Monaco v. Renton, supra. The control test is satisfied when the employer has the actual right of control, and it is not requisite to prove its actual exercise. Mahoney v. Nitroform Co., Inc., 20 N.J. 499 (1956).
Do the facts at bar demonstrate respondent's exercise or right of control over the petitioner in his work? We think not. Mr. Boyarin, the secretary of the respondent and a friend of petitioner, testified, "I'm in the business of selling chicks and in the course of selling chicks we give a farmer instructions as to how to raise the chicks even though farmers are in business for many years. Those same instructions were given to Mr. Marcus and then when Mr. Marcus was in trouble of any kind he would call me and I would take care of it." And he also testified that "when chicks had to be medicated I told Mr. Marcus that the chickens should be medicated. When chicks had to be vaccinated, I told Mr. Marcus that the chickens had to be vaccinated the same as I tell other farmers. That's a service that we give customers." In response to a query of the Deputy Director as to whether he gave petitioner any instructions as to the quantity of food to be fed the chicks, he said, "Yes. The same as we give other farmers. We recommend what we call a restricted diet." The reference was to farmers to whom chickens were sold by the respondent.
Ralph L. Colton, Jr., the president of the respondent-company, testified that he exercised no control over petitioner, and that it was not necessary to give him detailed instructions.
*592 We conclude that the petitioner was a skilled poultry man. He described himself as a "chicken farmer." The Deputy Director noted that petitioner "probably knew more about raising chickens than those who were in the Eastern Agricultural Association." He did not require or receive the type of supervision or direction sufficient to spell out control. The instructions he received were the same as those furnished by respondent as a service to its customers to whom it actually sold chicks. It certainly cannot be urged that in rendering such service to its customers, respondent exercised control over them. We fail to see how this indisputable custom in the trade can be given any greater effect in the stated instance. In 1 Larson's Workmen's Compensation Law (1952), § 44.20, the author says that:
"* * * an owner, who wants to get work done without becoming an employer, is entitled to as much control of the details of the work as is necessary to ensure that he gets the end result from the contractor that he bargained for. In other words, there may be a control of the quality or description of the work itself, as distinguished from control of the person doing it, without going beyond the independent contractor relation. * * *"
The end result here desired was quality chicks. The instructions to petitioner as to feed and medication were to insure that result. Beyond that, petitioner was free to select his working hours. He had no fixed time in which to perform. He was not controlled in the day-by-day performance of his work. He utilized his land and extensive equipment in the manner he deemed expedient. The fact that on one occasion he changed a gas heating system on his plant at the direction of the respondent is not persuasive of the existence of the employer-employee relationship. Employees do not ordinarily defray the cost of such improvements. We think he made the change and paid for it, in order to keep the respondent's business.
Nor is the fact that respondent provided the feed upon petitioner's order of determinative significance. The pending *593 litigation against petitioner for feed purchases may explain the necessity for this phase of their arrangement.
In the light of all the attendant circumstances, the totality of the proof seems to negate dominion by the respondent over the petitioner as an individual workman. Compare the situation here presented with one where the owner of a horse places it out for board and pasture. The party receiving the animal becomes a bailee. Fanshawe v. Rawlins, 87 N.J.L. 667 (E. & A. 1915). Agistment, which is the taking in and feeding or pasturing of horses, cattle or similar animals for reward, is a species of bailment. 3 C.J.S. Animals §§ 15 and 16.
In the absence of a showing of control, the weight accorded the various factors to be considered is dependent upon the facts in the particular case. Generally, payment of a fixed weekly sum to the worker is an indication of employee status. Here, however, the fixed weekly sum of $75 was predicated upon the boarding and raising of approximately 7,500 to 8,000 chicks. As a convenience to the parties, the initial agreement calling for a payment of $10 a week per thousand chicks was rounded out to a flat weekly figure of $75. The original arrangement between the parties was one of independent contractor, and plainly intended as such. No evidence was offered to indicate that the change in payment to the specific weekly sum was intended to convert the relationship between them to that of employer and employee. The amount of payment was predicated upon the quantity of chicks boarded, not upon the hours of work which were not in any way specified. He was free to select his time, subject only to the accomplishment of the end result. Furthermore, the weekly payment includes the use of petitioner's valuable facilities. Under the stated facts, the method of payment here practiced cannot be deemed significant indicia of employee status of the petitioner.
Larson (§ 44.35) states that "the power to fire is the power to control," and is not consistent with the concept of independent contract under which the contractor should *594 have the legal right to complete the project contracted for and to treat any attempt to prevent completion as a breach of contract. We are, however, mindful of situations where the parties contract for a recurrent relationship terminable at the will of either party. Respondent was under no obligation to continue sending chicks to the petitioner to be raised. There is no testimony to indicate that petitioner was under any obligation to accept the chicks (he was notified before each shipment), or that respondent was not free at any time to demand the return of the chicks. In our view, the specific facts at bar impel a finding of a mutual right to terminate an independent contractor relationship in the nature of a bailment at will as distinguished from the unilateral right of an employer to discharge an employee.
Larson (§ 44.34) says that
"When the employer furnishes valuable equipment, the relationship is almost invariably that of employment. When the employee furnishes such equipment, this circumstance may, if coupled with other factors, indicate independent contractorship, but in itself it is not necessarily fatal to a showing of employment based on other grounds."
Piantanida v. Bennett, supra. See also White v. Department of Labor and Industries, 48 Wash.2d 470, 294 P.2d 650, 654 (Sup. Ct. 1956).
In the case sub judice we regard the land and facilities of the petitioner used to feed and raise the chicks as a major factor in determining the relationship between the parties. The essence of the contract was not petitioner's personal labor, but rather his land and valuable equipment. The number of chicks delivered to petitioner to raise was dependent upon the quantity available and the extent of his facilities and equipment, not upon his labor.
Indisputably, the workers and employers under our system of free enterprise are permitted to make any arrangement they choose, and if a worker elects to be an independent contractor without workmen's compensation protection, rather than an employee with such protection, that *595 is his privilege. The device will not be countenanced whereby compensation legislation is thwarted by classifying workers as contractors, when in substance they are employees. Larson, § 46.10. The intent of the parties is entitled to considerable respect if it can be accurately ascertained, Larson, § 46.30. The petitioner throughout his testimony refers to an "arrangement" between the parties. Mr. Boyarin, for the respondent, disavowed any contract of hire. Six checks were received in evidence for six weekly payments in varied amounts to the petitioner during May, June, and July 1957. Two of the checks bore the notation that they were in payment for "boarding and raising" a certain number of chicks. Two checks were similarly noted with the inscription "b. & r." The remaining two checks had no notation. As we have already observed, there were no withholding tax, social security, or unemployment compensation deductions from the payments made to petitioner during the entire period of his arrangement with respondent. The absence of such usual employee deductions achieves a degree of importance it might not have under other circumstances. Cappadonna v. Passaic Motors, Inc., 136 N.J.L. 299 (Sup. Ct. 1947), affirmed 137 N.J.L. 661 (E. & A. 1948); Wilson v. Kelleher Motor Freight Lines, Inc., supra; Condon v. Smith, 37 N.J. Super. 320 (App. Div. 1955), affirmed 20 N.J. 557 (1956). Cf. Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282 (App. Div. 1958).
It is urged that petitioner's work should be considered in relation to the regular business of the respondent, and that under the "relative nature of the work test" advocated in Hannigan v. Goldfarb, supra, petitioner is deemed to be an employee. We think not. Under this test are considered whether the work performed is an integral part of the respondent's regular business and whether the petitioner in relation to the respondent's business is in a business of his own. Respondent maintained its own place to raise chicks and to produce and sell eggs. At the time of the hearing before the Division of Workmen's Compensation, petitioner *596 was the only farmer to whom respondent sent chicks to be raised. No evidence was presented to establish the totality of respondent's operation and the relation of petitioner's work to respondent's total business. Furthermore, as already observed, petitioner was a chicken farmer engaged in his own business of maintaining poultry, producing and selling eggs, until one month before his arrangement with respondent. He had not been financially successful. We view the arrangement as a resumption of a phase of petitioner's own business, with the financial security, meager as it was, of an independent contract.
We recognize that we are called upon to liberally construe the Compensation Act because it is remedial in nature. We conclude, nevertheless, that the proofs and legitimate inferences to be drawn therefrom preponderantly establish the existence of an independent contractor relationship.
The judgment of the County Court is reversed.
CONFORD, J.A.D. (dissenting).
I cannot agree with the majority's conclusion that petitioner was an independent contractor. In my view, while some aspects of the case give pause for reflection, the factual complex surrounding the relationship, considered in its entirety and analyzed in the light of the controlling principles of law and the social policy motivating workmen's compensation legislation, indicates an employer-employee status.
It is true, as the majority points out, that the criterion to which our courts have given the greatest weight in determining the character of the relationship is that of control, defined as supervisory power not only over what shall be done  the desired end result  but also over how it shall be done  the means for accomplishing that result. See, e.g., De Monaco v. Renton, 18 N.J. 352, 355 (1955); Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261, 264 (1953); Cappadonna v. Passaic Motors, Inc., 136 N.J.L. 299, 300 (Sup. Ct. 1947), affirmed per curiam *597 137 N.J.L. 661 (E. & A. 1948). However, while some measure of control is essential to a finding of an employer-employee relationship, see Mahoney v. Nitroform Co., Inc., 20 N.J. 499, 506 (1956), there are various situations in which the control test does not emerge as the dispositive factor. For example, where it is not in the nature of the work for the manner of its performance to be within the hiring party's direct control, the factor of control can obviously not be the critical one in the resolution of the case, but takes its place as only one of the various potential indicia of the relationship which must be balanced and weighed in determining what, under the totality of the circumstances, the character of that relationship really is. See De Monaco v. Renton, supra (18 N.J., at page 357); Hannigan v. Goldfarb, 53 N.J. Super. 190, 196 (App. Div. 1958). Thus, the requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be done and the capabilities of the particular person doing it. See De Monaco v. Renton, supra (18 N.J., at page 357) (newsboy selling papers on street); Fitzpatrick v. Haberman, 16 N.J. Super. 490, 495 (App. Div. 1951) (house painter). Patently, where the type of work requires little supervision over details for its proper prosecution and the person performing it is so experienced that instructions concerning such details would be superfluous, a degree of supervision no greater than that which is held to be normally consistent with an independent contractor status might be equally consistent with an employment relationship. In such a situation the factor of control becomes inconclusive, and reorientation toward a correct legal conclusion must be sought by resort to more realistically significant criteria. This seems to me to be such a case.
As of the time of the accident the relationship of the parties had become well stabilized. Respondent kept an average of 7,500 chicks on petitioner's farm for him to raise. He was told what kind and quantity of feed to use, *598 its variations at different age-levels of the birds, what kind of heating system to use, when and what kind of medication was necessary, and in what proportion to the feed. The chicks were examined by respondent's veterinarian, who gave petitioner instructions concerning vaccination. True, as indicated in the majority opinion, petitioner was free to select his working hours and was not closely controlled in the day-by-day performance of his work. But, on the other hand, the hours during which petitioner did work did not depend upon his personal inclinations but were dictated by the requirements of the work in presumably the same manner as if he had performed his labors on the premises of the respondent. The required daily routine left little room for variation or discretion. As he testified:
"Well, I got up in the morning when the chicks were under the stove. Naturally, I got to pick the stoves up, check the litter, change the water, put feed in the hoppers. * * * That took most of the morning, and in the afternoon, after lunch, I go back. I still got to fill up again the water of the jars. They drink that water quite often and again put feed in the hoppers, and turn the litter over. General cleanup you know. Stuff like that."
It is plain that the instructions given petitioner were those appropriate and necessary in the light of the respondent's requirements and the petitioner's special experience. There is nothing remarkable about hiring an employee with expert qualifications for his work. The circumstances here presented are not indicative of a general absence of control. The scope of petitioner's discretion and freedom from control as to minutiae is that which might well obtain even were petitioner an acknowledged employee of respondent in charge of the brooders and raising chicks on its own premises. The fact that petitioner's instructions were generally the same as those given to respondent's customers does not indicate otherwise. When given to the customers, the instructions constituted advice which the customer was free to follow, vary or ignore according to his own lights. When given to petitioner, they were orders *599 which it was incumbent upon him to obey, and were so understood by him.
"Q. (On cross-examination) * * * As I understand it, Mr. Marcus, the Eastern Agricultural Association sent the feed and mash to your place?
A. Yes, sir.
Q. And you used that as you saw fit?
A. No. Not exactly. It's still orders. I mean, I was given instructions how to feed, like so much a hundred, so much a thousand. I mean, that's the way it was.
Q. You were given instructions?
A. That's right, sir * * * I wouldn't take that responsibility on my own."
Moreover, the fact that Marcus may not have required or received such detailed instructions as ordinarily spell out control does not mean that respondent did not have the right to give them. See Mahoney v. Nitroform Co., Inc., supra (20 N.J., at page 506). In fact, the contrary is indicated. While respondent's agent visited petitioner only once a month, Marcus frequently telephoned him or visited respondent's office for information.
"Q. And these telephone calls that you made to Mr. Boyarin were for purposes, were they not, what to do?
A. Naturally. Again, that's the responsibility; it lays on the people that invest the money.
The Deputy Director: What was the nature of the information that you sought and what orders were given to you if any."
After reciting the types of instructions listed above, petitioner went on to explain, "I couldn't do everything on my own. I had to be told what to do." Thus the unmistakable import of the petitioner's entirely credible testimony is that he considered himself under respondent's control in all matters which could really make a difference in the method of raising the chicks.
I would, under all the circumstances, hold that there is sufficient evidence of control to justify de novo concurrence with both the deputy director's and the County Court's finding of a status of employee-employer insofar as the factor *600 of control is concerned. The equivocal aspects of the evidence as to this element, however, make requisite more careful weighing of all other factors bearing upon the nature of the relationship.
The application to the facts of this case of most of the other (than control) criteria customarily applied educes an inconclusive composite. The alignment of the individual circumstances here presented into pro-employee and pro-independent contractor lists is not particularly helpful  the mechanical process yields ambivalence more fruitful of debate than answers. Pointing to employee status are the method of payment, a regular weekly sum, see 1 Larson, Workmen's Compensation Law (1952), § 44.33(a), p. 646; Runk v. Rickenbacher Transportation Co., 31 N.J. Super. 350, 355 (App. Div. 1954); Fitzpatrick v. Haberman, supra (16 N.J. Super., at page 494); Wilson v. Kelleher Motor Freight Lines, Inc., supra (12 N.J., at page 265); Brown v. Paterson Central Market Ass'n, 5 N.J. Misc. 1035, 1036 (Sup. Ct. 1927), and the right of each to terminate the arrangement at will (respondent by not sending any more chicks and recalling those already on petitioner's farm; petitioner by refusing to accept chicks and sending back those already on the farm), see Larson (op. cit., supra, § 44.35, p. 654); Runk, supra; Fitzpatrick, supra; Brown, supra.
While the use of petitioner's valuable plant and equipment would ordinarily indicate the contrary result, Larson (op. cit., supra, § 44.34, p. 650), that is not so if the intent of the arrangement is both for the rendering of services and the rental of equipment, and, as to the services, the other relevant circumstances point to employment. See Piantanida v. Bennett, 17 N.J. 291, 296 (1955); Brown v. Paterson Central Market Ass'n, supra (5 N.J. Misc., at page 1037); White v. Department of Labor and Industries, 48 Wash.2d 470, 294 P.2d 650, 654-655 (Sup. Ct. 1956). The necessity for circumspection as to the equipment factor is consequently apparent. See White, supra. See also Cole v. Minnick, 123 Neb. 871, 244 N.W. 785 (Sup. Ct. 1932) (welding *601 and repair by employee in his own repair shop). There is some conflict in the testimony concerning the extent of petitioner's ownership of the facilities (he testifying that some of the brooders belonged to respondent, and respondent's president asserting that all of them were petitioner's), but it is clear that the bulk of the equipment was petitioner's property. Admittedly, his possession of a farm and equipment was one condition of his hiring. But so was the availability of his services, skill and experience. If he was an employee in that regard, applying such tests as are meaningful in respect thereto, his concomitant provision of plant and equipment, in itself, cannot derogate therefrom.
On the other hand, the fact that respondent made no payroll deductions is indicative of independent contractor status. See Condon v. Smith, 37 N.J. Super. 320, 324 (App. Div. 1955), affirmed per curiam 20 N.J. 557 (1956); Cappadonna v. Passaic Motors, Inc., supra (136 N.J.L., at page 301); Piantanida v. Bennett, supra (17 N.J., at page 294). But see Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 290-291 (App. Div. 1958), de-emphasizing the significance of this factor. The facts that respondent directed the heating change while petitioner paid for it (grudgingly  "I had to pay myself for some reason or other"); that petitioner was paid his customary wage while he was in the hospital; and that an employee of respondent was sent to his farm during that period to tend to the chicks (but deductions for the services of that employee were made from petitioner's receipts of payment from respondent after he had resumed his services for them upon his partial recovery) can be argued to point both ways. Note, however, that one customary aspect of an independent contractor status is lacking. Ordinarily, the services of the independent contractor are procured for the performance of a specific piece of work which can be completed within a calculable time. See, e.g., Congleton v. Pura-Tex Stone Corp., supra (53 N.J. Super., at page 291); Fitzpatrick v. Haberman, 16 N.J. Super. 490, 494 (App. Div. 1951); Condon v. Smith, supra (37 *602 N.J. Super., at page 325); Wilson v. Kelleher Motor Freight Lines, Inc., supra (12 N.J., at page 264); Brown v. Paterson Central Market Ass'n, supra (5 N.J. Misc., at page 1036). Cf. Forrester v. Eckerson, 107 N.J.L. 156, 158 (E. & A. 1930). Here there was a continuing relationship requiring the same labor to be performed for an indefinite duration.
The difficulty with the various tests in relation to the facts just mentioned is not only that they are not conclusive here, but also that they are not cohesive. They are not designed to operate together as a workable or realistic standard by which a given set of facts may be evaluated in the light of the philosophy and purposes of the statute. They may have utility where the inquiry into the work relationship is made in order to determine vicarious liability, tort or contract, as dependent upon agency. But they have less relevance as guides where the inquiry determines the scope of social legislation for the benefit of workers in business and industry. Effectuation of the policy of statutes in that category requires that their use of the term "employee" not be accorded a constrictive and mechanical definition but rather one geared to comport with the specific statutory purpose. Hannigan v. Goldfarb, supra (53 N.J. Super., at pages 194-195); Westover v. Stockholders Publishing Company, 237 F.2d 948, 951 (9 Cir. 1956) (construing the Federal Unemployment Tax Act, 26 U.S.C.A. (I.R.C. 1939) § 1600 et seq.); United States v. Silk, 331 U.S. 704, 711-712, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (construing the Social Security Act, 42 U.S.C.A. § 301 et seq.); Larson (op. cit., supra, at § 43.42, p. 630). Note the unified approach to cognate social service legislation in this field manifested by Chief Justice Vanderbilt in De Monaco v. Renton, supra (18 N.J., at pages 356, 357). Moreover, since these tests are subject to manipulation by a prospective employer, reliance thereon must be guarded. Larson (op. cit., supra, § 45.10, pp. 657-8), quoted with approval in Hannigan, supra (53 N.J. Super., at pages 205-206).
*603 In a case like this we must seek more pervasive and fundamentally relevant guideposts in implementation of the statutory objective. The purpose of workmen's compensation legislation, says Larson (op. cit., supra, § 43.51, p. 632), "* * * is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any workers whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the area of intended protection." And see Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 586 (1959). The test in the type of case before us here must, therefore, be essentially an economic and functional one, and the determinative criteria not the inconclusive details of the arrangement between the parties, but rather the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business. This court has already recognized the "logic, clarity and forthrightness" of the "relative nature of the work test," i.e., whether or not the work is a part of the regular business of the employer  especially where the worker is one in the general category meant to be protected by the act but whose right to protection is questionable under strict application of common-law principles. Hannigan, supra (53 N.J. Super., at page 206); Westover v. Stockholders Publishing Company, supra (237 F.2d, at page 951). The trend of other jurisdictions is toward the acceptance of this test where helpful. See Larson (op. cit., supra, § 43.54, p. 635).
There is no doubt of petitioner's economic dependence. Before entering into his arrangement with respondent he was forced by financial reverses to abandon all his hopes and plans for conducting a poultry business of his own. He had already liquidated his stock. As he testified, "I was out of a job and farming was pretty well almost lost to me." *604 The supplemental record shows petitioner's gross income for 1957 (including several months prior to the beginning of the arrangement with respondent) was $5,119.66, and his adjusted gross income, for tax purposes, $1,403.52. For 1958 the figures were $3,040 and $2,050.74, respectively. All but $100 of the gross income for 1958 was received from respondent. Aside from respondent, he has no other source of income except for the $100 rental of ten acres. He does not engage in any other farming activity for profit  his testimony as to his activities for respondent indicates that he would have little or no time to devote to a general farming enterprise of his own. Nor is he in the "business" of raising chickens for others; he does not hold himself out to other potential users of his services; he solicits no other business of the same type. See Larson (op. cit., supra, § 45.31(a), p. 669). Cf. Cappadonna v. Passaic Motors, Inc., supra (136 N.J.L., at page 301); Condon v. Smith, supra (37 N.J. Super., at page 324). In conspicuous contradistinction to a truly independent contractor, he has neither a risk of loss nor an opportunity for profits. See Westover, supra (237 F.2d, at page 951). He may, some time in the future, if the poultry industry revives, but his status must be adjudged as of the conditions and relationships obtaining when he was injured. He was entitled to no part of the proceeds from respondent's sale of chicks. He received only a regular income which depended little upon the vagaries of the respondent's business. He had no employees of his own. His only job was working for respondent, and his working time was devoted exclusively to it. He himself plainly could not bear the burden of an industrial accident.
There is also no question but that the work petitioner does is an integral part of respondent's business. It is exactly the same type of activity which respondent conducts on its own farm where it raises chickens. There are times when other farmers than petitioner raise chicks for respondent, but there is no indication as to whether they do so on a full-time basis or are only called upon when the capacity *605 of petitioner's facilities has been reached. It seems probable that respondent's reason for entering into its arrangement with petitioner was that its business exceeded the capacity of its own plant but did not justify the acquisition of another, so that it was most expedient for it literally to farm out the overflow. The proofs are overwhelming that petitioner can in no realistic sense be considered as a going economic entity separate and apart from respondent.
Thus, in the economic and functional sense, petitioner is an employee both from his point of view (as wholly dependent) and from that of respondent (as a continuing and sufficiently controlled operative in a regular part of its business). Under the plan and policy of the Workmen's Compensation Act, and the factual picture as a whole, petitioner is entitled to its protection. He is respondent's employee.
My vote is to affirm.