*Uninsured Employers' Fund v. Tyson Farms, Inc.*, et al.
Case No. 1057, September Term, 2018
Opinion by J. Wright


**WORKERS' COMPENSATION – NATURE AND GROUNDS OF EMPLOYER'S LIABILITY – IN GENERAL –** In a case where a party is employed by a landowner to manage his property, the landowner's status as an employer may be coextensive with another person or entity, if such person or entity exercises an appropriate degree of control over the party. Relevant to the determination of co-employment is the degree of control exercised by the landowner over the employee relative to that of the other person or entity. Where, as here, a landowner exercises minimal control over an employee, and a separate person or entity maintains substantial control over the day-to-day functions of that employee, that other person or entity may be properly determined to be a co-employer, and consequently falls subject to the level of legal responsibility commensurate with that designation.

Circuit Court for Worcester County
Case No. 23-C-16-0233

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1057

September Term, 2018

_____

UNINSURED EMPLOYERS' FUND

v.

TYSON FARMS, INC., *et al*.

_____

*Wright,
Gould,
Harrell, Glenn T., Jr.,
  (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wright, J.
Dissenting Opinion by Gould, J.

_____

Filed:  November 22, 2019

*Wright, J., now retired, participated in the
hearing and conference of this case while an
active member of the Court; after being recalled
pursuant to Maryland Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this Opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On April 15, 2014, Mauro Jimenez Garcia suffered an "occupational disease disablement" to his lungs, arising out of his work raising chickens on a farm owned by Dai K. Nguyen. The chickens on Mr. Nguyen's farm were raised for, and owned by, Tyson Farms, Inc. ("Tyson"), appellee. Mr. Garcia filed a claim against Mr. Nguyen under the Workers' Compensation Act[1] on June 27, 2014. The Uninsured Employers' Fund ("UEF"),[2] appellant, was made a party to the claim when it became clear that Mr. Nguyen did not possess workers' compensation insurance. Mr. Garcia and UEF then impleaded Tyson into the claim.

After a hearing on March 3, 2016, the Workers' Compensation Commission ("Commission") declared that Mr. Garcia's injuries arose out of the course of his employment, and that both Mr. Nguyen and Tyson were co-employers of Mr. Garcia at the time of his injuries. Tyson appealed the Commission's decision to the Circuit Court for Worcester County.

A two-day jury trial took place on June 19 and 20, 2018; the sole issue for the jury was whether Tyson was a co-employer of Mr. Garcia. After the presentation of evidence, UEF and Tyson made motions for judgment. The circuit court denied both motions. The jury, after being instructed in the applicable law (without objection), returned a verdict

---

[1] The Workers' Compensation Act is contained in Md. Code (1991, 2016 Repl. Vol.), Labor & Employment Article ("LE") §§ 9-101 to 9-1201.

[2] The purpose of the UEF, "pursuant to [LE] § 9-1002 of the [Workers' Compensation] Act, is . . . benevolent and remedial, that being to protect injured workers whose employers failed, either willfully or negligently, to carry workers' compensation insurance for them." *W.M. Schlosser Co. v. Uninsured Employers' Fund*, 414 Md. 95, 210-11 (2010) (quotations and citations omitted).

finding that Tyson was *not* a co-employer at the time of Mr. Garcia's injuries. UEF challenged the circuit court's ruling on its motion for judgment and presents a single question for our review, which we have reworded as follows:[3]

1. Did the circuit court err in denying UEF's motion for judgment?

For the reasons presented below, we answer this question in the affirmative and reverse the circuit court's judgment.

## BACKGROUND

The Farm & Mr. Garcia's Hiring

Tyson, the largest chicken producer in the country, does not own a single chicken farm. Rather, the company contracts with individual farmers to raise its chickens; the farmers own and operate the farms, while chickens are raised by the farmer according to Tyson's guidelines and best practices.

In 2009, Mr. Garcia was hired to work at a chicken farm where Tyson's chickens were being raised. The farm was owned by Terry Ung at the time. When Mr. Garcia was first hired, he performed routine maintenance, such as removing dead chickens, cutting the grass, and changing the lights. When Mr. Ung became ill toward the end of 2009,

---

[3] UEF presented its question to the Court as follows:

1. Was it error for the circuit court to deny the UEF's motion for judgment when the uncontroverted evidence established [that] Tyson exerted sufficient control over Mr. Garcia's performance of his job to make Tyson Mr. Garcia's employer as a matter of law?

2

Mr. Garcia began managing the farm. Upon Mr. Ung's death at the end of 2009, his wife, Lee Ung, became the owner of the farm.

Because Mrs. Ung was unfamiliar with raising chickens, Tyson representatives taught Mr. Garcia how to operate the farm. During this period, Tyson employees came to the farm between two and four times a week "to teach Mr. Garcia how to maintain the farm and raise the chickens." According to Mr. Garcia, "[the Tyson's employees] taught [him] everything. They showed [him] how the system worked, how to check the water levels, the feeding, temperature, fans, how [all of the systems] would work properly, [and] how to turn them on and off automatically." In addition to assuming day-to-day responsibility for the chickens, Mr. Garcia also began residing at the farm after Mr. Ung passed away, as Tyson required someone to be present 24 hours a day, 7 days a week, to ensure proper operation of the farm.

Mrs. Ung sold the farm to Dai K. Nguyen in 2013. Mr. Nguyen, who lived and worked in northern Virginia, did not know how to operate a chicken farm either and purchased the farm as an investment. Thus, Mr. Nguyen contracted with Tyson to raise its chickens on the farm in June of 2013 as an "absentee owner." Tyson will generally contract with an absentee owner if someone is on the farm 24 hours a day, 7 days a week, to respond to any emergencies that may arise with the chickens. Based on Mr. Nguyen's status, "Tyson and Mr. Nguyen agreed that the contract would only be approved if [Mr. Nguyen] agreed to keep Mr. Garcia on as the resident manager of the farm."

Broiler Production Contract

3

Mr. Nguyen and Tyson entered into a "Broiler Production Contract"[4] ("the

Contract").  Under the Contract, Tyson was required to:

> (1) "[R]etain title and ownership to chickens, feed, and medication[,] . . . [and] determine the amount, type, frequency, and time of delivery to and pick-up from [Mr. Nguyen] of chickens, feed, and medication[;]"[5]
>
> (2) "[P]rovide veterinary services and technical advice" to assist in raising the chickens; and
>
> (3) "[C]omply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of [the] Contract."

In return, Mr. Nguyen was obligated to:

> (1) "[F]urnish labor, materials, and utilities necessary for" raising the chickens and, when necessary, "seek [Tyson's] technical advice[;]"
>
> (2) "[M]aintain biosecure housing for [Tyson's] chickens, feed, and medication[;]"
>
> (3) "[I]mplement [Tyson's] recommended best animal management practices, including recommendations regarding lighting, brooding, watering, ventilation, and bedding[;]" and
>
> (4) "[C]omply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of [the] Contract[.]"

The Contract also gave Tyson the unilateral right to terminate the relationship

upon default by Mr. Nguyen.  Under the termination clause, a "default" occurs upon:

> Failure to comply with any provision of [the] Contract, including but not limited to compliance with all applicable environmental and litter

---

[4] Tyson refers to the chickens that are raised for meat as "broilers."  The term does not refer to the manner in which the chickens are cooked.

[5] During the duration of the Contract, signs bearing the Tyson logo were placed at the farm.  A Tyson employee testified at trial that the signs were there (1) so that delivery drivers would "be able to find the locations," and (2) to alert others that the farm was a "biosecure environment."

management laws, rules, regulations, and ordinances, and all requirements and programs contained in the attached Schedules.[6]

In the event of a default, Tyson had the right to "take immediate possession of [their] chickens, feed, and medication without further notice[.]" Tyson was further permitted to "utilize [Mr. Nguyen's facilities] . . . to complete the production of [the chickens] at [Mr. Nguyen's] expense."

The Contract also included various addenda that set out how chickens were to be raised on the farm. As an example, one 18-page document titled "Broiler Growing Guide," gave detailed instructions for raising a flock of chickens. These instructions began at the stage of preparing the facilities for a new flock through the chickens' seven-week life cycle, giving specific instructions on how to manage the flock's temperature, ventilation, water, food, and light exposure for each week. The guide also included requirements for the operation of various equipment and procedures involved in raising the chickens. According to Ronald Watkins, a Senior Manager of Live Production at Tyson, if failure to comply with "programs [such as those in the Broiler Growing Guide] leads to animal welfare issues or poor performance," such a failure could result in the termination of the Contract.

Tyson's Oversight of the Farm

Tyson engaged in a continual oversight process to verify that the farm was being operated in compliance with the Contract. To ensure that conditions were adequate for

---

[6] In addition to the above, the Contract contained three other scenarios that give rise to a default. As those scenarios are not relevant to this case, they will not be discussed here.

chickens to be placed on the farm, Tyson employees completed a 25-item "Broiler Placement Checklist" before each flock of chickens was placed. The checklist was reviewed with Mr. Garcia, as he was the "resident manager of the farm."

Tyson also had the right to visit the farm during the lifecycle of each flock of chickens to "evaluate animal [health] and welfare, and [to] provide any technical advice based on the current conditions of the farm[.]" Tyson employees visited the farm one to three times a week to assess the chickens' well-being. During these visits, Tyson employees completed a series of forms and checklists to evaluate the flock's quality of life. The "Flock Visitation Summary," for example, was completed at least weekly throughout the flock's life cycle and included various metrics to evaluate the chickens' feed, water, temperature, ventilation, and lighting. As Mr. Garcia lived and worked on the farm 24 hours a day, 7 days a week, Tyson would speak directly to him if anything needed to be adjusted. Mr. Garcia then carried out any necessary adjustments throughout the flock's lifecycle.

Mr. Garcia's Injury and Subsequent Litigation

Mr. Garcia was found to be occupationally disabled on April 15, 2014; he suffered from hypersensitivity pneumonitis and interstitial disease. On June 27, 2014, Mr. Garcia filed a claim against Mr. Nguyen under the Workers' Compensation Act. After it became clear that Mr. Nguyen did not have Workers' Compensation insurance, UEF was added as a party. Mr. Garcia and UEF then impleaded Tyson into the claim.

A hearing before the Commission took place on March 3, 2016. As Mr. Garcia states in his brief, "[t]here [was] no dispute that Mr. Nguyen was an employer of Mr.

6

Garcia at the time of [Mr. Garcia's] date of disablement for his occupational disease." Rather, the key issue was whether Tyson was also an employer of Mr. Garcia at the time he became disabled. After the hearing, the Commission declared: (1) that Mr. Garcia's occupational disease "[arose] out of and in the course of employment;" (2) that "[Mr.] Nguyen . . . and Tyson . . . were co-employers at the time of the aforesaid occupational disease[;]" and (3) that Mr. Nguyen and Tyson were liable to Mr. Garcia for his injuries.

Tyson appealed the Commission's findings to the circuit court on March 26, 2016, and challenged the Commission's determination that it was a co-employer of Mr. Garcia. After all the evidence was presented in the two-day jury trial that followed, both the UEF and Tyson made motions for judgment on the issue of Tyson's status as a co-employer. The circuit court rejected both motions and sent the matter to the jury; the jury returned a verdict that Tyson was not a co-employer of Mr. Garcia at the time he sustained his injuries. UEF subsequently filed this appeal.

## STANDARD OF REVIEW

Any party "aggrieved by a decision of the [Workers' Compensation] Commission" may seek judicial review of that decision in the circuit court. Md. Code (1991, 2016 Repl. Vol.), Labor & Employment Article ("LE") § 9-737. On appeal to the circuit court, the "decision of the Commission is presumed to be *prima facie* correct[,] . . . and the party challenging the decision has the burden of proof." LE § 9-745(b). "On a motion of any party . . . , the court shall submit to a jury any question of fact involved in the case." LE § 9-745(d). This Court has explained the standard for reviewing a circuit court's decision on a motion for judgment as follows:

7

> Pursuant to Md. Rule 2-519(a), a party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all of the evidence. The moving party shall state with particularity all reasons why the motion should be granted. The trial judge must consider the evidence, including the inferences reasonably and logically drawn therefrom, *in the light most favorable to the party against whom the motion is made*. If there is any evidence, no matter how slight, legally sufficient to generate a jury question, the motion must be denied.
>
> We review a trial court's grant of a motion for judgment under the same analysis used by the trial court. In other words, we assume the truth of all credible evidence on the issue, and all fairly debatable inferences therefrom, in the light most favorable to the party against whom the motion is made.

*Barrett v. Nwaba*, 165 Md. App. 281, 289-90 (2005) (emphasis in original) (cleaned up).[7]

## DISCUSSION

The sole issue on appeal is whether the circuit court erred in rejecting UEF's motion for judgment. In *Whitehead v. Safway Steel Products, Inc.*, 304 Md. 67, 76 (1985), the Court of Appeals explained the process for "distinguishing questions of law from matters of fact in the employment field." It stated that "whenever evidence in a labor case is disputed, *and* differing inferences from the evidence are possible, a jury must determine the underlying employment issues." *Id*. (emphasis in original). On the other hand, "where the evidence on an issue is uncontradicted, ordinarily a court may

---

[7] The Court of Appeals recently explained the recent increase in use of "cleaned up" as a parenthetical. The parenthetical "signals that the current author has sought to improve readability by removing extraneous, non-substantive clutter (such as brackets, quotations marks, ellipses, footnote signals, internal citations, or made un-bracketed changes to capitalization) without altering the substance of the quotation." *Lopez v. State*, 458 Md. 164, 195 n.13 (2018).

decide the issue as one of law." *Id.*[8] Furthermore, "[i]t is well established that 'where the essential terms and manner of employment are undisputed, the issue as to the relation between the parties and the nature of the employment is one for the [c]ourt.'" *Elms v. Renewal by Andersen*, 439 Md. 381, 394-95 (2014) (quoting *McElroy Truck Lines, Inc. v. Pohopek*, 375 Md. 574, 585 n.6 (2003)).

Bearing those standards in mind, our task is to determine whether the evidence related to Tyson's status as a co-employer was disputed and gave rise to "differing inferences" or whether the evidence was "uncontradicted." If the former is the case, then the circuit court properly denied UEF's motion for judgment and sent the question to the jury; if the latter is true, then the court erred in failing to treat the issue as a matter of law.

UEF contends that "the inescapable conclusion is that [Mr.] Garcia submitted to [Tyson's] control in the course of employment and [that] therefore Tyson was his employer for these purposes as a matter of law." To support their argument, UEF points to Tyson's: (1) training of Mr. Garcia; (2) sending a representative to review farm operations one to three times a week; (3) informing "Mr. Garcia of the tasks that needed to be done[;]" and (4) having the right to take control of its chickens and terminate the contract upon failure to comply with the conditions in the Contract.

In response, Tyson avers that its "minimal contact" with Mr. Garcia did not establish an "employment" relationship. Tyson specifically argues that Mr. Nguyen, the

---

[8] In *Whitehead*, 304 Md. at 76, the Court went on to explain that "[w]hile the trial court should take some pains to ensure that conflicting inferences are not possible on the presented evidence, something more than conjecture of a party is necessary to establish that 'conflicting inferences' are possible in a given case." (cleaned up).

owner of the farm, was an independent contractor for Tyson, and that "[t]he fact that Tyson had the right to inspect its flock . . . does not mean that they were in 'control' of [Mr. Nguyen's] employee," such that an employment relationship can be said to have existed. Tyson further supports its argument by noting the ability of Mr. Nguyen alone to hire, pay, and terminate Mr. Garcia, as well as the right to terminate the contract at will.

The Court of Appeals has established five criteria "[t]o determine whether the employer-employee relationship exists[.]" *Mackall v. Zayre Corp.*, 293 Md. 221, 230 (1982). Those factors include: "(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." *Id.* The Court of Appeals explained the relationship between the factors as follows:

> Of the five factors, the factor of *control* stands out as the most important. We have said, for example, that whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done is the '*decisive*," or '*controlling*' test. We have also recognized, in speaking to the interrelationship of the factors, that *standing alone*, none of these *indicia*, *excepting* . . . the factor of control, seems controlling in the determination as to whether such a relationship exists. Thus, for our purposes, 'decisive,' besides 'controlling,' means 'conclusive,' 'determinative,' and 'definitive.' This view is consistent with that expressed in other jurisdictions, where control has been variously described as 'the most vital factor,' 'the most important factor,' 'the most significant factor in all cases,' 'the most stressed element,' 'the final test,' and 'the crucial test,' when determining whether the employer/employee relationship exists.

*Whitehead*, 304 Md. at 78 (first emphasis added) (cleaned up).

Here, Tyson's control over Mr. Garcia's work was more than sufficient to establish an employment relationship as a matter of law. Specifically, as a condition of

10

its contract with Mr. Nguyen, Tyson required that Mr. Garcia remain on the farm 24 hours a day, 7 days a week, to manage its operation. In the contract itself, Tyson's 18-page Broiler Growing Guide detailed instructions and requirements for how to raise the chickens at each stage of their life cycle. This Guide included detailed instructions on how Mr. Garcia should adjust various factors such as the chickens' food intake, light exposure, and ventilation, on a weekly, if not daily, basis.

Further, Tyson's employees taught Mr. Garcia everything he needed to know about raising the chickens, including how to operate the various systems involved in the process. Tyson's employees inspected the farm before every new flock of chickens was delivered, came to the farm one to three times a week to evaluate how Mr. Garcia was raising the chickens, and subsequently informed Mr. Garcia of the tasks that he needed to complete to improve his performance. Importantly, Tyson held the unilateral ability to terminate its relationship with Mr. Nguyen if Mr. Garcia did not comply with the requirements in the Contract or those given to him by Tyson employees. Finally, Tyson posted its own signage at the farm, provided the feed that Mr. Garcia was to give to the chickens, contracted for the treatment of litter, and provided veterinary services to the chickens that were placed on the farm. Taken in sum, Tyson's extensive involvement in, and control over, Mr. Garcia's day-to-day operation of the farm gave rise to an employment relationship as a matter of law.

Tyson asserts that the other four factors in the test for determining whether an employment relationship exists "weigh heavily in favor of the conclusion that [it] is not an 'employer.'" Even assuming *arguendo* that this is the case, our conclusion does not

11

change.  As we explained above, the factor of control "stands out as the most important[,]" and is the only factor that is "'decisive' or 'controlling.'"  *Whitehead*, 304 Md. at 78.

The fact that Mr. Garcia was also an employee of Mr. Nguyen at the time he was injured does not alter our conclusion that Tyson was a co-employer.  In *Whitehead*, 304 Md. at 79, the Court of Appeals explained that "[a] worker may simultaneously be the employee of two employers."  *See also Mackall*, 293 Md. at 229 ("This Court has repeatedly recognized that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers.").  This was exactly the case here, where Mr. Garcia was an employee of both Mr. Nguyen and Tyson at the time of his injuries.

Comparing this case to *Marcus v. Eastern Agricultural Association, Inc.*, 32 N.J. 460 (1960), provides additional support for our holding.  In *Marcus*, appellant, an experienced chicken farmer, raised eggs for appellee, a company in the business of "producing and selling eggs, and in raising laying chickens."  *Marcus v. Eastern Agricultural Association, Inc.*, 58 N.J. Super. 584, 588 (1959).  At the time appellant was injured, he was typically raising about 7,500 to 8,000 chicks at a time for the appellee.  *Id*.  Under the agreement, appellee provided feed for the chicks, instructed appellant on how to feed the chicks, advised appellant on the provision of medication, and called in a veterinarian when required.  *Id*.  One of appellee's employees would visit "on an average of once a month" to review conditions on the farm.  *Id*.

12

In reversing the Superior Court's Appellate Division judgment that there was *not* an employer-employee relationship, the New Jersey Supreme Court adopted the reasoning in Judge Conford's dissenting opinion from the decision below. *Marcus*, 32 N.J. at 247. Judge Conford explained that the control test was not the "dispositive factor" where the nature of the work "require[d] little supervision over details" and where the appellant was "so experienced that instructions concerning such details would be superfluous." *Marcus*, 58 N.J. Super. at 597. In other words, because the "day-by-day performance of [appellant's] work" was "dictated by the requirements of the work" and "left little room for variation or discretion," the Court would have to go beyond the control test to determine whether appellant was employed by appellee. *Id*. at 598.

Judge Conford focused on the purpose of workers' compensation legislation and analyzed "the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." *Id*. at 603. Judge Conford concluded that appellant was an employee deserving of protection under the [Workers'] Compensation Act. The New Jersey Supreme Court adopted that conclusion as its holding. *Marcus*, 32 N.J. at 247.

Here, the level of control that Tyson had over Mr. Garcia *far* exceeded the level of control that the appellee in *Marcus* had over the appellant. Not only were Mr. Garcia's day-to-day activities "dictated by the requirements of the work," *see Marcus*, 58 N.J. Super. at 598, but they were also "dictated" by the specific requirements that Tyson relayed to him through the contract with Mr. Nguyen and through its constant inspections and visits. While the facts in *Marcus* forced Judge Conford to look beyond control to

13

determine whether the appellant was an employee of the appellee, the circumstances here allow us to conclude that based on the level of control that Tyson had over how and when Mr. Garcia completed his work, Tyson was a co-employer of Mr. Garcia.

In the face of what we consider overwhelming support for our conclusion in this case, we turn to the other arguments Tyson made to suggest that it was *not* a co-employer of Mr. Garcia. Specifically, Tyson relies on *North Chesapeake Beach Land & Imp. Co. v. Cochran*, 156 Md. 524 (1929), to support its argument that it should not be held liable for merely "supervising" its independent contractor to ensure compliance with the contract. Despite Tyson's attempt to argue the contrary, *Cochran* supports our holding that Tyson was a co-employer of Mr. Garcia at the time he was injured.

In *Cochran*, 156 Md. at 526, appellant entered into a contract to drive piles for appellee and was severely injured while performing the task. The key issue on appeal was whether appellant was an "employee" of appellee for the purposes of workers' compensation liability. *Id.* at 526-27. While completing the job, appellant received intermittent feedback, as well as a request to alter the construction plans, from the president of the company. *Id.* at 527-28. At trial, the sixth prayer instructed the jury that "if they found 'that . . . [the president of the company] retained control and supervision of the work, then these facts tend to show that [appellant] was . . . an employee." *Id.* at 533.

In concluding that such a jury instruction should not have been given, the Court of Appeals stated that:

> [T]he mere fact that the employer reserves a right to supervise or inspect the work during its performance does not make the contractor a mere servant, *where the mode and means of performance are within control of*

14

*such contractor.* The right of the employer to go upon the premises and see that the work is being done according to the specifications of the contract does not affect the relations of the parties so as to constitute the employee a mere servant. If the contract provides that the work shall be done 'under the direction' and subject to the approval of the employer, a closer question is presented[.]

*Id*. at 534 (emphasis added).

Applying the reasoning from *Cochran* here, we conclude that Tyson's relationship with Mr. Garcia went well beyond "mere supervision." Far from allowing Mr. Garcia to control the "mode and means of [the] performance" of his responsibilities, *Cochran*, 156 Md. at 534, Tyson was intimately involved in nearly every aspect of the work that Mr. Garcia did at the farm, providing Mr. Garcia with specific instructions on how and when to perform certain tasks and to dictate specifically those responsibilities. Though we agree with Tyson's general proposition that mere supervision is insufficient to establish an employment relationship, the company's conduct here went well beyond that modest level of interaction. As such, applying *Cochran* to this case supports the conclusion that Tyson was a co-employer of Mr. Garcia at the time of his injuries.

As a final point, we will address Tyson's attempt to distinguish this case from *Whitehead*, *supra*. In *Whitehead*, appellant was a temporary worker supplied to appellee by a temporary help agency. 304 Md. at 70-71. When appellant was injured on the job, he filed a workers' compensation claim against the agency, and a negligence suit against the appellee. *Id*. at 71. At trial, the circuit court granted appellee's motion for judgment notwithstanding the verdict, thereby declaring that "[appellant] was [appellee's]

15

employee and that his exclusive remedy was under the [W]orkmens' [C]ompensation laws." *Id*. at 71. Appellant appealed the judgment to this Court.

In holding that the appellant was appellee's employee at the time he was injured, this Court explained that:

> [Appellee] had the right to instruct [appellant] on the tasks to be performed, had the power to reassign him to a different job within the plant, and supervised and directed his actions and rate of work. [Appellee] could have discharged the employee from its premises if [appellant's] work was unsatisfactory.

*Id.*. at 81-82.

Tyson relies on this language, and argues that the appellee in *Whitehead* claimed that appellant was its employee, to suggest that this case should come to a different outcome than in *Whitehead*. We do not agree. Most importantly, there is simply nothing in *Whitehead* to suggest that only a specific set of circumstances must be present to find sufficient control for an employment relationship. Despite any factual differences that may exist between this case and *Whitehead*, we have concluded that here, Tyson exercised extensive control over Mr. Garcia's work at the farm, such that Mr. Garcia was an employee of Tyson for workers' compensation purposes.

Even comparing the facts of this case to those in *Whitehead*, as Tyson would have us do, does not alter our conclusion. As was the case in *Whitehead*, Tyson directed Mr. Garcia's tasks at the farm, and it had the power to instruct Mr. Garcia to alter his performance in doing those tasks to be in compliance with Tyson's requirements. Though Tyson did not have the express authority to discharge Mr. Garcia, it had the power to terminate its contract with Mr. Nguyen if Mr. Garcia was not in compliance

16

with Tyson's requirements. And as Mr. Nguyen testified at trial, if the contract had been terminated, he would not have been able to keep Mr. Garcia as an employee. Finally, though the appellee in *Whitehead* argued that the appellant was its employee, while Tyson now argues the opposite as to Mr. Garcia, that has no bearing on the outcome of this case. It is only the circumstances of the relationship that determine the outcome, and those circumstances demonstrate that Mr. Garcia was an employee of Tyson's at the time he suffered his disability.

## CONCLUSION

At the end of the two-day jury trial, both Tyson and Mr. Garcia moved for judgment, thereby signaling their common understanding that Tyson's status as a co-employer should be decided as a matter of law. As the evidence here demonstrates that "differing inferences" from the evidence are *not* possible, *see Whitehead*, 304 Md. at 76, we agree with the parties' common understanding that there was no material factual dispute and that the outcome depended solely on the application of the law to the undisputed facts. Thus, because Tyson was a co-employer of Mr. Garcia at the time he was injured, we further hold that the circuit court erred in not granting UEF's motion for judgment and reverse the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED; COSTS TO BE PAID BY APPELLEE.**

17

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1057

September Term, 2018

_____

UNINSURED EMPLOYERS' FUND

v.

TYSON FARMS, INC., *et al.*

_____

*Wright,
Gould,
Harrell, Glenn T., Jr.,
(Senior Judge, Specially Assigned)

JJ.

_____

Dissenting Opinion by Gould, J.

_____

Filed: November 22, 2019

*Wright, J., now retired, participated in the hearing and conference of this case while an active member of the Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this Opinion.

I respectfully dissent. In my view, there are sufficient facts in the record to allow a reasonable jury to determine, as it in fact did here, that Tyson was not Mr. Garcia's co-employer.

As the majority notes, the governing legal principles come from the Court of Appeals' decision in *Whitehead v. Safway Steel Prod., Inc.*, 304 Md. 67 (1985). In *Whitehead*, the Court explained the standard for determining whether a party's status as an employer may be determined as a matter of law:

> First, the decisions of this Court make clear that whenever evidence in a labor case is disputed, *and* differing inferences from the evidence are possible, a jury must determine the underlying employment issues. Both of the cases which the parties cite for our perusal support this point.

> Second, where the evidence on an issue is uncontradicted, ordinarily a court may decide the issue as one of law. While the trial court should take some pains to ensure that conflicting inferences are not possible on the presented evidence, something more than conjecture of a party is necessary to establish that "conflicting inferences" are possible in a given case. At the very least, a party must point to *evidence* in the case that control of a given function is vested in more than one person.

*Id.* at 76 (emphasis in original) (internal citations omitted) (cleaned up).[1]

The majority opinion does not discuss *Great Atl. & Pac. Tea Co. v. Imbraguglio*, 346 Md. 573 (1997), where the Court of Appeals applied the principles enunciated in *Whitehead*. There, the trial court determined at the summary judgment stage that, as a

---

[1] The root of my disagreement with the majority is, I believe, found in our respective interpretations of this passage from *Whitehead*. It appears that the majority sees "differing inferences" and "uncontradicted evidence" as mutually exclusive, and if the evidence is uncontradicted, the issue is one of law for the court to decide. In my view, the evidence may be both uncontradicted and susceptible to differing inferences, in which case the issue should go to the jury. As explained below, this is one such case.

1

matter of law, the parent and sister companies of the plaintiff's direct employer were co-

employers.  Relying on *Whitehead*, the Court of Appeals disagreed with the trial court

and explained the demarcation between issues of fact or law:

> Ordinarily, the existence of the employer/employee relationship is a
> question reserved for the fact finder. *Mackall v. Zayre Corp.*, 293 Md. 221,
> 230, 443 A.2d 98, 103 (1982). When, however, the existence of the
> relationship is undisputed, or the evidence on the issue is uncontroverted,
> *unless conflicting inferences can be drawn from that evidence*, the trial
> court is entitled to treat the matter as a question of law. *Whitehead v.
> Safway Steel Products*, 304 Md. 67, 76, 497 A.2d 803, 808 (1985).

*Imbraguglio*, 346 Md. at 590 (emphasis added).[2]  Based on these principles, the Court

held:

> There is no evidence from which the trial court could have concluded, as a
> matter of law, that (1) [the parent or sister corporation] possessed the power
> to select and hire the decedent, or that (2) someone other than [the direct
> employer] paid his wages, (3) had the power to discharge him, or (4) had
> the power to control his conduct. *See Whitehead*, 304 Md. at 77-78, 497
> A.2d at 808. At best, the record evidence cuts both ways.

*Id.* at 593.

In my view, based on the evidence before the jury, the instant case more closely

aligns with *Imbraguglio* than with *Whitehead*.  For example, Tyson's representative

testified at trial that: (1) Tyson did not select or hire Mr. Garcia; (2) Mr. Nguyen, not

Tyson, set and paid Mr. Garcia's wages; (3) Tyson had no ability to fire Mr. Garcia; (4)

---

[2]     Further, the Court in *Imbraguglio* stated, again relying on *Whitehead*: "Because of
the increasing complexity of the employer/employee relationship, we believe that in multi-
party cases, the employer/employee relationship will most often be a question of fact, not
of law."  346 Md. at 593 n.13.

2

Tyson had no ability to set Mr. Garcia's work hours; and (5) Tyson would communicate with Mr. Nguyen about changes in practices for raising chickens.

In addition, Mr. Nguyen testified that: (1) he authorized Mr. Garcia to act on Mr. Nguyen's behalf in running the farm, from which a jury could reasonably have concluded that Tyson's interactions with Mr. Garcia were in Mr. Garcia's capacity as Mr. Nguyen's agent, not as Tyson's employee; (2) it was Mr. Nguyen's obligation to take care of his employees and service the contract with Tyson; (3) only Mr. Nguyen had the power to terminate Mr. Garcia's employment; and (4) Mr. Nguyen had the contractual ability to terminate his grower contract with Tyson and enter into a contract with another poultry company, suggesting that Mr. Nguyen, rather than Tyson, had ultimate control over whether Mr. Garcia continued to have a job raising chickens.

The Court of Appeals in *Imbraguglio* reminded us not to "confuse control of the workplace with control of the worker." 346 Md. at 592. With that in mind, in my view the evidence in this case allowed for the reasonable inference that, notwithstanding the specificity in Tyson's contractually-required procedures and practices for raising chickens, Tyson did not have the requisite control over Mr. Garcia to be considered his employer. At a minimum, as the Court of Appeals found in *Imbraguglio*, the evidence "cut both ways." *Id.* at 593. I would, therefore, affirm the judgment of the circuit court.